State ex. rel. Barrett v. Carondelet Planing Mill Co.

THE STATE ex rel. JESSE W. BARRETT, Attorney-General, v. CARONDELET PLANING MILL COMPANY, CRESCENT PLANING MILL COMPANY, JOHN M. DARR & SONS PLANING MILL COMPANY, FOX BROTHERS MANUFACTURING COMPANY, GRAVOIS PLANING MILL COMPANY, HUTTIG SASH & DOOR COMPANY, KIRKWOOD SASH & DOOR COMPANY, MECHANICS PLANING MILL COMPANY, MESSING PLANING MILL COMPANY, NORTH ST. LOUIS PLANING MILL COMPANY, REED & STEEGER SASH & DOOR COMPANY, RIDDLE-REHBEIN MANUFACTURING COMPANY, FRANK SCHMIDT PLANING MILL COMPANY, THOMPSON PLANING MILL COMPANY, CHARLES THUENER PLANING MILL COMPANY and WELLSTON PLANING MILL COMPANY.

In Banc, July 3, 1925.

1. **COMBINATION IN RESTRAINT OF TRADE: Lists upon Which to Submit Bids.** Where the only provisions contained in the agreement and by-laws of a bureau of planing mill corporations which have any tendency to affect trade or free and open competition are those providing for the taking by the bureau and use by the members of uniform lists of items and quantities of millwork upon which the members may submit bids, and none forbidding a member from making his bid as low as he desires, or even purposely taking a loss, regardless of the list of items and quantities, in order to secure a given contract, and none fixing or suggesting any method of fixing the amount of any bid, further than uniformity of items and quantities bid upon, and the stated purpose of the bureau is to advise members proposing to bid of the exact items and quantities they will be required to furnish in order to comply with the plans and specifications for the particular building, and to save to the members and to the public the unnecessary cost of each bidder taking off items and quantities for himself, the association and bureau cannot be held to be an unlawful combination in restraint of trade in the absence of some showing that said lists were used to impede and restrain open competition for bids.

309 Mo. Sup.—23.

2. ————: ————: Forbidding Unsolicited Bids: Hidden Meaning in By-Law: Injury to Public. A by-law of the bureau of an association of planing mill companies, declaring that "members making application to the bureau for lists of items and quantities of millwork shall present plans and specifications, or other data and information, for the proposed building for which the list of items is required, or furnish to the bureau other good and sufficient evidence that they have a bona-fide request to submit a bid on such millwork," does not forbid unsolicited bids, and should not be construed as forbidding unsolicited bids where there is no proof that any member was ever required to produce evidence that he had been requested to bid upon the items and quantities to be furnished to a proposed building before he was furnished a list thereof taken from the plans and specifications already in the possession of the bureau. Nor does such by-law mean that lists of items and quantities would not be prepared unless an actual building was contemplated for which a contract would be let; but even if that were the meaning intended to be expressed, the building public, even if it were enforced, would not be injured by it, for all a builder would have to do to avoid its effect would be to request bids of all members.

3. ————: Lists of Items Desired for Building: Furnished to Bidders Only by Bureau of Members. The taking of lists of items and quantities of millwork desired in the construction of a contemplated building, by a bureau of an association of planing mill corporations, if honestly and properly conducted, is necessarily calculated to save time and expense, not only to its members who desire to bid for a contract to furnish the needed materials, but to the owner of the building; and a provision in a by-law of the bureau that all lists of the materials to be furnished within the city and adjoining county shall be taken by the bureau, and that members thereof shall be debarred from making their own lists, if it does not operate to restrain free and open competition, is not unreasonable or unlawful; for, assuming that the bureau is of value, its support is a proper matter to be guaranteed by a requirement that its lists shall be used by its members, in order to insure to the bureau proper financial support; and especially so, where there is no evidence that any member was ever permitted to acquire from the bureau knowledge of the bids or business of his competitors.

4. ————: Means Employed. If the plan and operation of an association of planing mill corporations are not illegal, the means provided to insure its maintenance may not reasonably be condemned.

5. ————: Prohibiting Members from Using Own Skill and Judgment: Specialists. A by-law of the bureau of planing mill companies pro-

hibiting its members from using their own skill and judgment in making lists of items and quantities of millwork needed in the construction of a contemplated building, is not to be condemned as unlawful, where ambiguities appear in the plans and specifications, and the likelihood of mistakes is lessened by the employment by the bureau of specialists to make quantity surveys and to secure from the architect an interpretation of the plans and specifications and to furnish guaranteed lists, thereby materially reducing the cost of reliable lists, eliminating overestimates and subsequent disputes, and increasing the number of bidders.

6. ———: **Within Restricted Territory.** A requirement that members of the bureau of planing mill companies take from the bureau its guaranteed lists of needed quantities of millwork, before submitting bids to furnish the same, for only such buildings as are about to be constructed in the city or county of St. Louis, cannot be considered a restriction upon competition in one locality and a leaving of the members free to compete freely and fully in other localities, where there is active competition by non-member mills located in the city and by other mills located elsewhere, and a reasonable explanation of the compulsory requirement is that it took in enough productive territory to insure the financial support of the bureau.

7. ———: **Uniformity of Bids.** Bids made by planing mill companies, based upon guaranteed lists of the items and quantities of millwork needed in the construction of buildings prepared by specialists employed by a bureau composed of such companies, and made for the purpose of lessening mistakes in the items and quantities and to avoid improvident contracts, do not violate the statutes forbidding agreements or understandings in restraint of trade or free competition. The elimination or lessening of mistakes in the lists may result in an approach to uniformity of bids among efficient mills, but the making of correct and dependable lists eliminates from the bids extra allowances to cover the costs of probable mistakes and resultant disputes, and uniformity brought about by such means does not injure the building public. Nor is a uniform and prescribed form of bids objectionable.

8. ———: ———: **Published Cost Guide: Unused.** A printed cost guide, prepared by the secretary and manager of the bureau of planing mill companies alleged to be a combination in restraint of trade, showing what he conceived to be the prevailing costs of labor, material and overhead in 1917, said actual costs as found by him being doubled in order that members could test out their own costs in comparison with those used therein, although distributed to all the members and the bureau paid the expense of its distribution, did not establish uniformity in bids, or operate to

restrict competition, where there was no agreement among the members to use it or to be bound by it, and no showing that, by some sort of secret understanding, arbitrary percentages upon the costs therein stated were to be or had been applied to the lists of items and quantities of millwork entering into their bids; and particularly so where the actual bids made while the cost guide was in their hands disprove any such secret understanding.

9. ————: **Guilt Not Presumed.** A *quo warranto* proceeding to oust respondents from further enjoyment of the corporate franchises and to confiscate their property or impose fines upon them, for alleged violations of the statutes forbidding pools, trusts, agreements, combinations, confederations or understandings in restraint of trade or competition, is largely in the nature of a criminal prosecution, and their guilt will not be presumed upon mere possibility or suspicion, but it devolves upon relator to satisfy the court of their guilt by clear and satisfactory evidence.

10. ————: **To Resist Demands of Labor Unions.** The activities of an association of corporations, in cooperating by work and money to resist the demands of organized labor, do not fall within the inhibitions of the statutes forbidding combinations in restraint of trade.

11. ————: **Disseminating Information.** An association between corporations for the purpose of disseminating information relating to a proper basis for extending credits to their customers is not illegal, and such work is not to be condemned, unless carried to the point of lessening competition.

12. ————: **Study of Costs.** The study of the costs of labor and materials incurred in the business organized and carried on by competitors of the members of an association charged to be an illegal combination, where no agreement upon prices is shown, either in the plan or in actual practice, is not inhibited by the statute.

13. ————: **Incidental Restraint.** Where restraint of trade is merely incidental to the plan of an organization whose object and purpose are not otherwise illegal, the statute against illegal combinations is not violated.

---

Corpus Juris-Cyc. References: Monopolies, 27 Cyc. p. 899, n. 87; p. 901, n. 97; p. 908, n. 63.

## *Quo Warranto.*

RESPONDENTS DISCHARGED.

*Jesse W. Barrett,* Attorney-General, and *Henry Davis,* Assistant Attorney-General, for relator.

(1)    The evidence very clearly shows that the respondents, who are engaged in the manufacture and sale of woodwork for buildings, associated themselves together in an organization for the purpose of restraining full and free competition and that they adopted rules, regulations, devices and practices which, singly and in combination, have the effect of lessening competition in the manufacture and sale of millwork products in St. Louis and St. Louis County.    The inevitable result of their organization with its rules, regulations, agreements, devices and practices was to make the prices for said products higher and more uniform than they were prior to the formation of such organization.    The Millmen's Association, both in purpose and in effect, has violated the anti-trust statutes of Missouri.    Chap. 88, Art. 1, R. S. 1919; Northern Securities Case, 193 U. S. 404.    All of said agreements are direct restraints of trade and every direct restraint of trade is condemned by the statute. Sec. 9656, R. S. 1919; State ex rel. v. Boeckeler Lumber Co., 254 S. W. 414; State ex rel. v. Ice Co., 246 Mo. 221; State ex inf. v. Standard Oil Co., 218 Mo. 379; State ex inf. Crow v. Armour Packing Co., 173 Mo. 388.    (2) Even if true, the argument that certain of the restraining agreements were never actually observed is no defense. It is the agreement that is condemned.    State ex inf. Major v. Arkansas Lumber Co., 260 Mo. 302; State ex inf. Major v. International Harvester Co., 237 Mo. 394. (3) A combination by competitors in restraint of trade violates the statute even though it does not constitute a monopoly of its given field.    All that is required is the showing that the respondents had arrangements or agreements which tend to lessen competition in the sale of their products.    State ex rel. Sager v. Polar Wave Ice Co., 259 Mo. 608; State ex inf. v. Armour Packing Co., 173 Mo. 391.    (4)    Injury and prejudice to the public from a combination in restraint of trade may be inferred

and direct proof is not necessary. The gravamen of the offense of conspiracy is the combination. State ex inf. v. Armour Packing Co., 173 Mo. 390; State ex inf. v. Standard Oil Co., 218 Mo. 458; State ex rel. v. Boeckeler Lumber Co., 254 S. W. 414.

*Jones, Hocker, Sullivan & Angert* for respondents.

(1) The charge here is an infraction of a criminal law and must be proven accordingly. State ex inf. v. Tobacco Co., 177 Mo. 1; State ex inf. v. Packing Co., 265 Mo. 147. (2) An association is not illegal merely be-cause composed of men in the same line of business. State ex inf. v. Live Stock Exchange, 211 Mo. 198; Anderson v. United States, 171 U. S. 616; Berch v. Underwriters' Assn., 241 S. W. 430. (3) The intent of the members of this association is of controlling significance in arriving at their guilt or innocence. 19 R. C. L. sec. 33, p. 58. (4) "Tell me what you have done under a deed, and I will tell you what the deed means." Lord Chancellor SUGDEN, quoted in Ry. Co. v. Ry. Co., 101 Fed. 795; Ins. Co. v. Dutcher, 95 U. S. 273; Patterson v. Camden, 25 Mo. 22; Gas Light Co. v. St. Louis, 46 Mo. 127. (5) There can be no combination in restraint of trade by a single individual. R. S. 1919, sec. 9658; Union Pacific Coal Co. v. United States, 173 Fed. 745; United States v. Store Co., 16 N. M. 3.

*Charles A. Houts* and *D'Arcy & Neun* for certain respondents.

*F. L. Cornwell* and *John T. Hicks* for respondent John M. Darr & Sons Planing Mill Company.

(1) The John M. Darr & Sons Planing Mill Co. was not a corporation, either *de jure* or *de facto*, at the time of the institution of this action, its corporate existence having terminated by the limitation contained in its articles of incorporation. 14a C. J. p. 1099, sec. 3689; Mera-

mec Spring Park Co. v. Gibson, 268 Mo. 394. (2) Upon the termination of the corporate existence of the company originally incorporated as John M. Darr & Sons Planing Mill Co., its properties, assets and effects passed into the hands of the individuals then constituting its board of directors and were held by them as trustees for the benefit of the stockholders and creditors, if any, of the company. Sec. 9816, R. S. 1919; Bradley v. Reppell, 133 Mo. 522, 34 S. W. 841; Richards v. Coal Co., 221 Mo. 158; Meramec Spring Park Co. v. Gibson, 268 Mo. 394. (3) Proceedings *quo warranto* will lie against an individual or individuals only in case of the usurpation of an office or franchise. Sec. 2066, R. S. 1919.


BLAIR, J.—This is an original proceeding by *quo warranto,* wherein we are asked to oust respondents from further enjoyment of their corporate franchises under the laws of this State and to confiscate their property or impose fines upon them, because of alleged violation of the statutes of this State forbidding pools, trusts, agreements, combinations, confederations or understandings in restraint of trade or competition. [Secs. 9655, 9656 and 9658, R. S. 1919.]

Respondents Fox Brothers Manufacturing Company and Huttig Sash & Door Company are corporations organized under the laws of other states and duly authorized and licensed to do and were doing business in this State as foreign corporations. The other respondents are corporations organized under the laws of Missouri.

The information was filed July 1, 1921. On July 7, 1921, an information was filed in the case of State ex rel. Barrett v. Boeckeler Lumber Company, which case thereafter proceeded to hearing and judgment and is reported in 301 Mo. 445 et seq. During the pendency of that case the present case was not pressed to a hearing.

Our writ in the case at bar was issued on July 8, 1921, and service of such writ was accepted by certain

attorneys, as "attorneys for respondents," on July 14, 1921. On November 5, 1921, and after the disposition of certain motions, not necessary to be noticed now, respondents filed their answer and return.

It appears that some question was raised touching the authority of counsel, who filed the answer and return as "attorneys for respondents," to represent respondent John M. Darr & Sons Planing Mill Company, and said respondent filed its separate answer and return on January 17, 1923.

On February 21, 1922, this court made an order appointing Honorable Dorsey W. Shackleford as commissioner, with authority to take such testimony, to issue subpoenas, to compel attendance of witnesses and production of books, papers, and other documents, to issue attachments therefor and to hear and determine all objections to testimony, and report such testimony and his proceedings, thereon to this court. Our said commissioner was given no authority to and did not report his conclusions upon the facts and the law.

Certain motions were filed and disposed of by this court, which will not be noticed unless it becomes necessary in the course of the opinion. A motion to re-instate certain testimony, previously ordered to be stricken out by this court, was taken with the case and will be noticed later in the opinion, if deemed necessary.

Our commissioner proceeded to take testimony in the case and, on September 24, 1924, filed his report. In due course the case came on for hearing, was briefed and argued by counsel and is thus before us for consideration and determination.

The issues of fact appear from the following allegations of the information:

"Relator informs the court that respondents have created, entered into, become members of and participated in a pool, trust, agreement, combination, confederation and understanding among themselves and each other which tends to and does result in the restraint of lawful trade and full and free competition in the man-

ufacture and sale of mill work in this State, with the purpose, design and view to regulate, control and fix the price of mill work, to maintain such price when so regulated and fixed, to fix the amount and quantity of mill work bought and sold and to lessen lawful trade and full and free competition in the manufacture of mill work in this State, all to the great detriment and damage of the purchasing public and the people of the State of Missouri.

"Relator further states that by reason of the participation of said respondents in the pool, trust, agreement, combination, confederation and understanding as herein stated, and by reason of the acts and things done by respondents as herein set forth, said respondents have been guilty of illegal, willful and malicious perversion and abuse of the franchises, licenses and authority severally granted to them by the State of Missouri, and illegal and unlawful usurpation of privileges, franchises and authorities not granted to them by the State of Missouri."

The answer and return first filed and the separate answer and return of respondent John M. Darr & Sons Planing Mill Company are substantially alike and specifically and generally deny the foregoing allegations of the information.

All the respondents were members of the St. Louis Mill Men's Association at the time this proceeding was begun. Three of the respondents resigned therefrom in July, 1921. Respondents are engaged in the planing mill business, which consists of the manufacture of the various articles of woodwork used in the construction of buildings. Their product is of two kinds, special and stock millwork. Special millwork is made to order in accordance with plans and specifications for the particular building. Stock millwork is made up in quantities in standard sizes and materials, without reference to any specific building. The Mill Men's Association has been in existence for over thirty years. Formal articles of association were drawn up in 1914 and again on January

1, 1919. It was operating under the 1919 articles when the information was filed in this case. Said articles provided for the organization of a listing bureau, which was organized August 14, 1919, and known thereafter as Planing Mill Listing Bureau. For convenience, we will refer to these organizations as ''association'' and ''bureau.''

The association had the usual officers and committees. It held weekly meetings, at which an attendance fee was provided. The object and purpose of the association, as declared by Article 9, was to devote its funds ''to the payment of all duly authorized expenses which may be incurred under the provisions hereof and in carrying out the lawful purposes of this association; to the payment of all proper costs and expenses which may be incurred in opposing, resisting and defending against any unjust or unlawful demands of organized labor, should any such demand be presented or made; in preventing or removing any unjust or unlawful discriminations against the members or their output or product; in obtaining and procuring all such information as the officers or appropriate committees may be able to obtain or procure, the better to enable the members of the association to arrive at a fair and proper basis for extending and giving credit to buyers; and for ascertaining the cost of labor and material and of the manufacture of millwork, and in the adoption and execution of any lawful plans, or any other purposes, which, by vote of a majority of the association, may be deemed conducive to the welfare of the association, and not violative of any rule of business or of law.''

Article 10 provided for the employment of a secretary to devote his time and energy to the best interests of the association. Payment of one-fifth of one per cent of the net cost of the work covered on each and every list of items received from the listing bureau, to be thereafter formed, was provided to defray the expenses of the association.

Article 11 provided that information, gathered for the use of the members of the association, and lists of items, taken off by the bureau, should not be furnished to any one not a member of the association or the bureau. Other articles of the association need not be noticed unless reference thereto becomes necessary in the determination of the case.

The object and purpose of the organization of the Planing Mill Listing Bureau are stated in the agreement as follows:

"Whereas, Under the present methods of carrying on the planing mill business in the City and in the County of St. Louis, in the State of Missouri, a large volume of needless work is required of the planing mills in taking off of items from specifications and other data, or information, furnished as the basis of estimates of items of planing mill work requisite and necessary to the furnishing and completion of that branch of the building business, thereby needlessly increasing the cost of production to the planing mills and the price to be paid therefor by the builder and owner, to the common loss and detriment of all parties concerned.

"And Whereas, The subscribers hereto believe that through co-operation as hereinafter set forth, a substantial reduction in the cost to the planing mills of manufactured articles can be secured, and a corresponding reduction made to the builder and to the owner of the improvements in which the millwork is to be used, thereby encouraging and advancing the building business in the City of St. Louis, and the interests of all parties concerned.

"Therefore, It is mutually agreed," etc.

We quote the following from the articles of agreement:

"ARTICLE II.

"The authorized officers of said Planing Mill Listing Bureau shall employ adequately skilled and competent quantity surveyors, whose duty it shall be to make correct and uniform lists of items and take quantities from

plans and specifications, or other data and information, of all millwork to be figured on and for which lists are requested, when such work is to be used in the City or County of St. Louis, State of Missouri, for the use and benefit of the Planing Mill owners and operators who are parties hereto, to the end that there may be fair and impartial competition, based upon reliable lists and quantities of work to be furnished among the competitive mill owners and operators associated in this undertaking.

"ARTICLE III.

"All lists of items and quantities for millwork to be used in the City and County of St. Louis, State of Missouri, required by members to be figured on, shall be obtained by the subscribers hereto from the Planing Mill Listing Bureau.

"ARTICLE IV.

"Section 1: It shall be optional with the members of the Planing Mill Listing Bureau as to whether or not lists of items and quantities for millwork to be used outside of the City and County of St. Louis shall be listed by the Bureau or not.

"Section 2: When lists are furnished by the Planing Mill Listing Bureau to any members for work to be used outside of the City and County of St. Louis a payment of 3/10 of 1 per cent of the total cost of the work covered by such lists shall be paid to the Planing Mill Listing Bureau as full remuneration for services rendered and no further payment shall be required, whether or not a contract results from such lists.

"ARTICLE V.

"Section 1: When any party to this agreement is requested to furnish a bid for millwork, to be used in the City or County of St. Louis, he or they shall thereupon promptly communicate with the Planing Mill Listing Bureau and arrange with it to secure a correct list of items or quantities of such work as is required to be furnished under the bid in question, except as set forth in Article XV of the By-Laws.

"Section 2: The Planing Mill Listing Bureau shall prepare all lists requested by members without delay, so far as this may be done, consistent with accuracy and completeness, and shall forward such lists to the members as speedily as practicable, either by mail or by other method of delivery which may be determined upon in order to best serve the purpose.

"ARTICLE VI.

"The respective subscribers hereto shall pay to the Planing Mill Listing Bureau, for services rendered by it, an amount equal to two per cent of the total amount of all work done, contracts taken and sales made, based on lists furnished to them by the Planing Mill Listing Bureau, and on all sales of millwork, of whatever kind as defined in printed proposals form now in use or hereafter adopted by the members, to be used in the City and County of St. Louis, Missouri whether listed by the Bureau or not.

"(Reporter's Note: On the left hand margin of the above Article VI in front of a bracket appears the following written with a lead pencil: 'Amended—See Section 2 of Articles of Agreement.')

"ARTICLE VII.

"No representative or employee of the Planing Mill Listing Bureau shall be privileged or allowed to submit or fix the price for any list of items or quantities which it furnished which would authorize or enable the recipient to make use of the same in any prospective bid based thereon; the submitting of prices and bids for millwork being reserved exclusively for the subscribers hereto. Neither shall the Planing Mill Listing Bureau nor any of its employees furnish lists of items or quantities to any person or persons other than those signing this agreement. Members are likewise forbidden to furnish to others any lists, or copy of lists, received by them from the Planing Mill Listing Bureau.

"ARTICLE VIII.

"For the purpose of creating a fund to provide for the guaranty of the correctness of the list furnished by

the Planing Mill Listing Bureau, and for such other purposes as may be necessary and expedient in carrying forward and developing the usefulness of the Planing Mill Listing Bureau, to its members, it is hereby provided that 20 per cent of all income is to be set aside and a separate account of it kept and that no part of this fund be used for the general expenses of the Planing Mill Listing Bureau.''

The By-Laws of the bureau contain articles dealing with place of business, board of directors and officers and their duties. Article VII is as follows:

''With the consent of and in conjunction with the Board of Directors the Secretary shall have full charge of the office of the Planing Mill Listing Bureau and its employees. It shall be his duty to see to it that competent quantity surveyors are employed and that all lists of items and quantities requested by members are furnished promptly and that such lists are accurate and complete. He shall have kept necessary books and records so that the return of sales, etc. made by the members, may be checked and properly charged against them in accordance with 'Agreement,' and shall collect and turn over to the treasurer all money due the Planing Mill Listing Bureau for services rendered. For the purpose of facilitating this work he, or his representatives, shall have access to the books and records of the members for the purpose of verifying the returns. It shall also be his duty to be present at all meetings of the Planing Mill Listing Bureau and of the Board of Directors and to perform such other duties as may be necessary for the carrying on of the work of the Bureau.''

Article XIV provides that any individual, firm or corporation conducting a general planing mill business in the city or county of St. Louis shall be eligible to membership in the bureau, upon a majority vote of the members present at any regular meeting and upon conformance to other conditions. There is no provision limiting membership to members of the association.

Section 1 of Article XV is as follows:

"As the principal purpose for which the Planing Mill Listing Bureau was established was to secure u- niform lists of items and quantities of millwork for its members and to do away with the duplication of work, the great difference in quantities, and the many errors resulting from the practice of each member taking his own lists of items and quantities, it has been determined by the members, in accordance with Article III of the 'Agreement,' that the taking of lists of items and quan- tities for millwork, to be used in the City and County of St. Louis, shall be done exclusively by the Planing Mill Listing Bureau and that the members are themselves de- barred from taking any list of items and quantities of millwork unless they first consult the Planing Mill List- ing Bureau and secure its consent, except as follows:"

Then follow certain exceptions, which need not be noticed.

Article XVI is one of the sections upon which re- lator relies to support his contention. It reads as fol- lows:

"Members making application to the Planing Mill Listing Bureau for lists of items and quantities of mill- work shall present plans and specifications, or other data and information, for the proposed building or work in question for which the list of items is requested, or furnish to the Planing Mill Listing Bureau other good and sufficient evidence that they have a bona-fide request to submit a bid on such millwork."

Article XVII covers matters relating to the time of payments to the bureau by members for lists of items and quantities furnished to them and to discounts there- on. Among other things, it is provided that "members shall report all sales including contracts and work taken during the preceding month, in the City and County of St. Louis."

Articles XVIII, XIX and XX deal with the manner of determining the amount of payments upon contracts made and work taken and upon lists taken by the bureau and for assessments upon the members of the bureau

368        SUPREME COURT OF MISSOURI.

State ex rel. Barrett v. Carondelet Planing Mill Co.

under certain circumstances, and fixed an arbitrary basis for making such assessments. Article XXII, section 1, is as follows:

"The Planing Mill Listing Bureau guarantees the correctness of its list of items and quantities to the members, and will reimburse them for any loss suffered by shortages through oversight or error for which the Bureau is responsible. Whenever a member has a legitimate claim against the Bureau he shall present a claim for same to the 'Claims Committee.' This committee shall be composed of three members and appointed by the President."

The remaining sections of said Article XXII contain rules under which such reimbursement shall be made. Article XXIII provides for an appeal by any member from the decision of the board of directors to the membership of the bureau upon any matter deemed vital. Article XXIV is as follows:

"Any member of the Planing Mill Listing Bureau failing or refusing to comply with the 'Agreement' and the By-Laws or with any resolution passed by a two-thirds majority of the members present at any meeting, shall be subject to expulsion and in addition thereto, if any of the provisions for returns and payments, either in the case of work or contracts taken or sales made or failure to secure lists in accordance with the 'Agreement' and By-Laws, such member shall be required to pay double the price provided for services both in the case of work taken and the list which he failed to procure from the Planing Mill Listing Bureau. And provided further, that unless all such charges imposed are paid within thirty days from the time they accrue, all services of the Planing Mill Listing Bureau shall be discontinued to any such offending members."

The remaining articles deal with voting rights of members, quorums at meetings, retirement of members and withdrawal of proportionate shares of funds on hand, establishing and furnishing offices, that no salaries shall be paid directors, amendment of by-laws and order

of business at meetings of the bureau. All of respondents were members of the bureau.

It will be noted that the only provisions contained in the agreement and by-laws of the bureau having any tendency to affect trade or free and open competition, are those provisions providing for the taking by the bureau and use by the members of uniform lists of items and quantities upon which the members may submit bids. There is found no provision forbidding any member from making his bid as low as he desires, or even purposely taking a loss, regardless of the list of items and quantities, in order to secure a given contract. No provision fixes or suggests any method of fixing the amount of any bid, further than uniformity of items and quantities bid upon has such tendency.

The stated purpose of the bureau is to advise members proposing to bid of the exact items and quantities they will be required to furnish in order to comply with the plans and specifications of the particular building and to save to the members and to the public the unnecessary cost of each bidder taking off items and quantities for himself.

Relator finds evidence of restraint of competition in the requirement of Article XVI of the by-laws of the bureau that members making application for lists shall furnish to the bureau evidence that they have a bona-fide request to submit a bid on a particular job of millwork. Such evidence of bona-fide request is only required to be furnished where the member does not present "plans and specifications or other data and information" for the particular building or work. The language of this clause is said to forbid unsolicited bids.

It would appear that the provision was not seriously regarded by the bureau because all the proof upon the point is to the effect that no member was ever required to produce any evidence that he had been requested to bid before he was furnished a list taken from the plans and specifications or other data or information already in the possession of the bureau.

309 Mo. Sup.—24.

Respondents argue that the wording of Article XVI does not express the meaning the members of the bureau intended to express and what they intended to provide was that lists would not be prepared unless an actual building or other work was contemplated, for which it was expected a contract would be let. It may be that such was the real purpose; but it is not expressed in the language used. Article V, section 1, above quoted, is to the same effect. However, assuming that the members intended the meaning actually expressed by the language used, it does not appear that the provision was ever enforced, as so expressed, or that, even if it had been so enforced, how the building public could have been injured thereby. All a builder has to do to avoid the effect of this provision is to request bids of all members. This does not involve preparation of any more copies of plans and specifications.

Relator condemns the provision of the by-laws that all lists upon work in the city and county of St. Louis shall be taken by the bureau and that members shall be debarred from making their own lists, except in certain specified instances involving work of only minor character. Honestly and properly conducted, the taking of such lists by the bureau is necessarily calculated to save time and expense, not only to the members, but to builders. Assuming that the existence of the bureau is of value and does not operate to restrain free and open competition, its support is a proper matter to be guaranteed by a requirement *that its lists shall be used by the members,* in order that the bureau shall not fail because of financial non-support. Access to the books of the members by accredited representatives of the bureau, in order to determine, not only the sums for which they are liable to the bureau, but also that they are living up to their agreement to furnish it an opportunity to earn its own support, does not appear to be reprehensible in itself. No provision is found whereby any member may benefit by knowledge of the books of competitors acquired by the agents of the bureau. There is no evidence

that any member was ever permitted to acquire knowledge of the bids or business of his competitors in this way. The testimony is that this did not occur. Only when a contractor represented to a member that another member had underbid him could such member learn from the secretary only the ultimate fact whether or not such statement was false.

Only by a requirement that copies of bids made and knowledge of the amount of work and contracts actually taken by members be furnished to the bureau, could it intelligently render statements to the members of the amounts due from them for its maintenance and support. Assuming that the plan and operation of the bureau itself are not illegal, the means provided to insure its maintenance may not reasonably be condemned.

The prohibition of the bureau against members using their own skill and judgment in making lists of items and quantities of millwork is assailed by relator. The likelihood of mistakes is lessened when quantity surveys are made by specialists in that line of work. When ambiguities appear in plans and specifications, the surveyors of the bureau secure the interpretation of the architect in respect to same, thus eliminating subsequent disputes, which are possible where a number of bidders, taking off their own lists, are unable or unwilling to go to the trouble to secure such interpretations for themselves. Plans and specifications may be appropriately identified so that subsequent changes and alterations are readily detected and further disputes eliminated. We think the evidence fairly supports the contention of respondents that more bids were submitted after the formation of the bureau than were submitted before it was formed. It appears reasonable that this should be true. When guaranteed lists of items and quantities are available, mills, which are not in a position to take their own lists, are able to prepare and submit a bid upon reliable and guaranteed lists made up and ready for their immediate use.

It is also readily apparent, and the evidence so shows, that the cost of taking off such lists is very materially reduced by committing that work to a single capable and responsible agency. Some, if not all, of this benefit must be passed on to the public, because there are a number of planing mills not members of the bureau. The effect of their competition may be greatly reduced by applying to the bids of members such reduced cost of making surveys. While sixteen planing mill corporations were members of the bureau, the record shows that there were at least eleven incorporated and unincorporated planing mill concerns which were not members. The volumes of their respective businesses, as shown by the record, compare very favorably with that of respondents, with the possible exception of the Huttig Sash & Door Company, whose business is largely stock millwork for the wholesale trade.

The feature of the bureau which guaranteed the accuracy of its lists is pointed out as necessarily adding to the bids of members. It would seem that, in the absence of such a guaranty, ordinary prudence would compel a millman to add something to a bid which he makes, upon a list taken by him, in order to protect himself against loss due to underestimating items and quantities. Under the plan of the bureau, this risk is assumed by the members as a whole and the individual bidding member can safely eliminate that contingency from his bid, only considering it in the cost of the service of the bureau. The thing is as broad as it is long. Builders as a whole must pay for this risk in the long run.

The requirement that the members take lists from the bureau upon all business in the city and county of St. Louis, while no such requirement is made as to outside business, is cited as evidence that the listing work of the bureau is calculated to restrict competition in one locality, while leaving the members free to compete fully and freely in other localities. Some substance might be found in this suggestion if all the millmen of the city and county of St. Louis were members of the bureau and com-

petition on outside business was only furnished by mills located elsewhere; but such is not the case. Since the record shows active competition by non-members within this field, we are satisfied respondents have not succeeded, if such was their purpose.

A reasonable explanation for such limitation is found in the necessity of taking in enough productive territory, where bureau lists are compulsory, to insure sufficient financial support for the bureau. Members may also avail themselves of the service of the bureau in listing items and quantities upon outside work. Where plans and specifications for such work are drawn by outside architects more trouble and expense may be incurred in securing access to them and in obtaining interpretations, if needed. These considerations suggest that reasons existed for so limiting the compulsory listing work of the bureau to the city and county of St. Louis, other than the unlawful purpose of hampering building operations therein with a combination to restrict competition.

It may be admitted that, when millmen all bid upon the same lists of items and quantities, greater uniformity of bids may be expected than when each bidder takes off his own list. One factor making for a wide spread in bids is thus largely eliminated. If all mills are equally efficient, so that their costs are approximately the same, and the same percentage of profit is applied, bids intelligently made upon identical things should be expected to approach uniformity. True, identical lists made by expert surveyors greatly lessen the chances of mistakes in items and quantities, so that a builder now and then may not have the questionable advantage of an opportunity to profit by the carelessness or incompetence of a millman. But we are not prepared to hold that measures, taken by agreement of competitors to prevent builders from profiting by mistakes resulting in the making of improvident contracts, violate our statute forbidding agreements or understandings in restraint of trade or free competition. It is the public as a whole which is the object

of legislative solicitude in this regard. If competitors are not permitted to agree upon measures to eliminate, or at least to lessen, mistakes as to items and quantities, upon which bids are based, individuals, exercising ordinary business sagacity and acting alone, must recognize the possibility of mistakes and make allowance in their bids to meet such contingency. They will add such allowance in making up their bids and the building public will ultimately foot the bill.

Another feature of the bureau said to tend to restrict competition is the requirement of uniform forms of bids. We are unable to find any objection to this feature or to understand how builders may be injured when bidders submit their proposals in identical form. This obviates the necessity for a close study of a given bid to determine whether it really covers the work required by the plans and specifications. It lessens the possibilities of trickery on the part of bidders. We are impressed with the thought that uniformity in the terms and phraseology of bids is a distinct benefit to the builder, instead of being an injury.

John P. Larson was secretary of the association and of the bureau and managed the bureau. He was being paid a total salary of nine thousand dollars a year by the two organizations at the time the testimony was taken. He was apparently a trained and experienced mill man. He kept the minutes of the meetings of the association. He informed himself concerning matters of interest to the planing mill operators and from time to time made talks at meetings. Relator lays considerable stress upon certain improprieties said to have occurred in these talks. Mr. Larson discussed general conditions affecting the planing mill business. He discussed price tendencies, building prospects, general building conditions and their application to the planing-mill business. He told the members that falling prices would halt building operations; that the country as a whole was very greatly behind in necessary building. He predicted that the needed building program would go on and high prices

prevail. He sought to discourage members from going after unprofitable business, or loading themselves with unprofitable business out of season, which would prevent them from taking profitable business when the real season opened. He disparaged the making of unsolicited bids. He urged the members not to forget profits. Thus the tendency of his talks was to discourage the cutting of prices.

None of the minutes covering Mr. Larson's talks indicate any agreement among the members as to prices or the presence of any understanding which would tend to fix prices or to affect free and unrestricted competition among the members. The contention of respondents, that the main purpose of the association was to combat what the members conceived to be unwarranted and ruinous aggressions of organized labor, is borne out by the talks of Mr. Larson, in which labor conditions and strikes and matters in relation thereto occupied the largest and most prominent place. It does not appear that any action was ever taken by the association upon Mr. Larson's recommendations. All of the witnesses for respondents deny that any such action was taken collectively or by any part of the membership. Relator has offered nothing but the minutes of the meeting containing such talks and they do not show that any action whatever was taken. We are not prepared to hold that mere presence at such talks committed the members to unlawful trade practices, even if we assume that, if the members had agreed to carry into effect the suggestions of Mr. Larson, they would have been guilty thereof.

In the year 1917, Mr. Larson prepared and distributed to the members of the association a so-called cost guide. It was based upon what he conceived to be the prevailing costs of labor, material and overhead. Its preparation was undertaken while he was secretary and in the employment and pay of the association. The association paid the expense of putting the cost guide in the hands of its members.

In preparing the cost guide, Mr. Larson doubled the actual costs found by him in order that members could test out their own costs, in comparison with those used in the cost guide, and determine for themselves what discounts to apply. His idea evidently was that, if the then prevailing actual costs were used, the members would sometimes have to use a percentage *above* the cost guide and at others a percentage *below* it, depending upon whether subsequent costs of labor, material and overhead were higher or lower than in 1917. Doubling the 1917, prices would probably make the figures stated in the cost guide always *above* actual costs and require only the application of discounts. The testimony shows, however, that prices subsequently rose to such an extent that a percentage above the doubled 1917 costs, used in the cost guide, sometimes had to be applied.

Some of the witnesses likened the cost guide to an interest table used by bankers or a table of logarithms used by mathematicians. It is very clear that the cost guide, as prepared, could not possibly have been used to fix uniform prices, unless 1917 prices had uniformly prevailed It does not appear that the cost guide was ever revised to fit subsequent prices. It was of practical use and value only when the member using it had determined for himself his own costs and continued to keep so informed.

Some of the members used the cost guide as a basis by applying discounts to it, based upon their own costs ascertained by continued and actual tests. Other members discarded it entirely as impracticable and unworkable. No agreement to use it was shown and it does not appear how its use could have restricted competition, unless approximate 1917 costs had prevailed and the members had bound themselves to apply it, or unless an arbitrary percentage upon the costs therein stated had been applied to the lists prepared by the bureau by some sort of secret understanding. Of this there is not the slightest proof. We are satisfied that the worst which may be said against the association and the bureau is that they afford a cloak under which the possibility of engaging

in unlawful practices and agreements in restraint of trade and free and open competition may conveniently be hidden. If we assume that the cost guide is not what it purports to be, and that there exists a secret agreement by which some sort of key may be applied to it, it must be conceded that such cost guide, applied to uniform lists of items and quantities, would make for uniformity of bids and thus tend to restrict competition.

But we are not permitted to presume the guilt of respondents upon mere possibility or suspicion. This proceeding is largely in the nature of a criminal prosecution and it devolves upon relator to satisfy us of the guilt of respondents by clear and satisfactory evidence. [State ex inf. v. Tobacco Company, 177 Mo. 1, l. c. 37; State ex inf. v. Packing Co., 265 Mo. 147.] This we find relator has not done.

Actual bids made while the cost guide was in the hands of the members and while they were taking their lists of items and quantities from the bureau disprove the existence of any secret agreement. Respondents offered in evidence their Exhibits 7 and 8, covering 488 pages of the printed record. These exhibits are tabulations which include the number of a particular list, with the names of all members bidding on such list and the amount of each bid made. The exhibits are prepared from many thousands of bids. They purport to have been made from actual records of the bureau. There is no proof of their inaccuracy. Such records were submitted to the study and inspection of relator. The exhibits purport to include all bids made by respondents upon lists furnished by the bureau from March, 1917, to October, 1921 (Ex. 7), and from October, 1921, to March, 1924 (Ex. 8).

Necessarily, we could not make a detailed study of such voluminous exhibits. To reproduce even the most meager outline thereof would be impracticable. Relator has not undertaken to criticize said exhibits in his brief, other than to suggest that there is some uniformity in the bids.

We have taken portions of said exhibits at random and herein set out a table containing four different portions thereof. Each group includes seven lists in consecutive order, where five or more bids are noted. Such examples therefore are not selected. We have examined said exhibits sufficiently to be confident that the examples used are fairly typical of bids generally. One-half of the examples are taken from each exhibit. With this explanation, we submit such table:

| List | High | Low |
|------|------|-----|
| 4456 | $2,975 | $2,264 |
| 4468 | 718 | 671 |
| 4472 | 947 | 765 |
| 4474 | 1,239 | 875 |
| 4477 | 1,081 | 895 |
| 4480 | 2,939 | 2,613 |
| 4496 | 551 | 498 |
| 9202 | 832 | 750 |
| 9206 | 374 | 363 |
| 9208 | 17,402 | 9,900 |
| 9209 | 5,291 | 4,498 |
| 9211 | 2,143 | 1,550 |
| 9212 | 4,250 | 3,240 |
| 9217 | 3,768 | 3,393 |
| 12206 | 6,228 | 4,400 |
| 12212 | 1,910 | 1,742 |
| 12218 | 4,683 | 3,920 |
| 12225 | 3,973 | 3,248 |
| 12226 | 92,500 | 78,755 |
| 12227 | 698 | 595 |
| 12246 | 1,239 | 1,156 |
| 15150 | 4,562 | 3,743 |
| 15155 | 1,450 | 1,195 |
| 15168 | 2,033 | 1,625 |
| 15169 | 730 | 687 |
| 15170 | 257 | 174 |
| 15179 | 1,989 | 1,183 |
| 15193 | 532 | 414 |

State ex rel. Barrett v. Carondelet Planing Mill Co.

A study of the table shows that there was usually a spread between the high and low bids sufficient to satisfy the most exacting scrutiny that actual competition occurred. We have also devoted some time to an examination of said exhibits, in order to ascertain relative differences of bids other than high and low bids. We find no striking uniformity of bids. If all of the bids but but one were high and close together, it might indicate prearrangement in order to throw the particular contract to a mill secretly selected by respondents to secure such contract. We find no evidence of any such arrangement.

Aside from these exhibits, which show only bids submitted by members of the bureau, the evidence shows that non-members usually submitted bids also, which in some cases were higher and in others lower than bids made by members. Such is the situation which would be expected if all bids were made under free and open competition.

The various decisions of this court and of the Federal Supreme Court have settled the legal propositions controlling here. There can no longer be any question under our statutes that any agreement, arrangement, understanding, pool or combination among competitors, in the classes of business mentioned in said statute, which tends to lessen lawful trade or full and free competition, is illegal. [State ex rel. Barrett v. Boeckeler Lumber Co., 301 Mo. 445, l. c. 543; State ex inf. v. International Harvester Co., 237 Mo. 369.]

The agreements and articles of association and by-laws of the association and the bureau, and the testimony concerning the acts and conduct of respondents, fall far short of showing agreements and understandings such as were condemned in cases where we have adjudged pretended competitors guilty of making agreements or doing acts or indulging in conduct in restraint of trade. The activities of the association, in cooperating by work and money to resist the demands of organized labor, do not fall within the inhibition of our statute. Its work of disseminating information in respect to a proper basis for extending credits may not be condemned, unless carried

to the point of lessening competition. Such was the situation, among others, in the Boeckeler Lumber Company case, where rules affecting credits were adopted and enforceable by penalties. There is not a hint of such conduct here. Nor does the study of costs of labor and materials, organized and carried on by competitors, come within the inhibition of our statute, where no agreement upon prices is shown, either in the plan or in actual practice. The cost guide had no such tendency, as we have found. It was educational merely and advisory at most.

The only possible basis for criticism is found in the provisions authorizing and enforcing the use of lists of items and quantities made by the bureau. We are convinced that the honest purpose of the bureau was to eliminate unnecessary mistakes, which could not possibly have been of legitimate benefit to builders and to reduce costs in taking off lists. It may be conceded that the making of bids by competitors upon identical things has a tendency to lessen the spread between high and low bids and thus reduce the likelihood of improvident bids being made by competitors. But this tendency is completely overbalanced by the benefits derived.

Whatever tendency to lessen competition is inherent in the listing work of the bureau, is incidental and clearly not the main purpose of the organization. We have held that, where restraint of trade is merely incidental to the plan of an organization whose object and purpose are not otherwise illegal, the statute is not violated. In State ex inf. Hadley v. Standard Oil Co., 218 Mo. l. c. 379, and in referring to what are now Sections 9655, 9656 and 9658, WOODSON, J., said:

"They prohibit the making of all contracts and combinations which have for their object and purpose the restraint of trade or the fixing and maintaining of prices; but those sections in no manner denounce as illegal any contract regarding trade which has for its object a legitimate purpose and which only incidentally stifles trade."

The listing work of the bureau did not go to the extent of "stifling trade." It only tended to eliminate

certain doubtful benefits to a builder now and then growing out of mistakes. This very fact worked to the benefit of builders as a whole.

We have reached our conclusion in this case almost entirely upon the facts of the case. It is only necessary to apply well-settled rules to such facts. We hold that the plan and the practices of the respondents in the creation and operation of the St. Louis Mill Men's Association and the Planing Mill Listing Bureau constitute no violation of our statutes. It may be that, by secret arrangement and by the use of these organizations, respondents might engage in the unlawful practices denounced by our statutes; but relator has not shown that this has been done. Possibility or suspicion alone is not sufficient. We, therefore, find respondents not guilty as charged.

It is unnecessary to pass upon the motions affecting the testimony of the expert economists. The conclusions we have reached are not based upon their opinions. We have drawn our own conclusions upon the voluminous facts in evidence.

The respondents should be discharged, and such is our order. All concur except *Woodson, J., dubitante,* and *Atwood, J.,* not sitting.