BIRDIE HEATH, Appellant, v. SIMON N. HEATH, CANNIE HEATH, his wife, and JOSEPH L. LEONE, Respondents, No. 41135—222 S. W. (2d) 778.

Division One, July 11, 1949.

Rehearing Denied, September 12, 1949.

 

*E. McD. Colvin* and *J. F. Quillin* for appellant.

*Leslie J. Lyons* and *Donald E. Lyons* for respondents.

BRADLEY, C.—Action in equity to set aside four warranty deeds to lot 40, Munroe Heights Addition, Kansas City; the trial chancellor denied the relief sought; dismissed plaintiff's petition; she appealed.

Appellant signed three of these deeds under the impression that they were, in effect, mortgages. Appellant is a widow, about 60 years old; not related to the Heath respondents. Prior to her present troubles she owned the house and lot in question; she and her deceased husband acquired the place about 1926. Her home was in Kansas City, but she had resided in Tucson, Arizona, where her husband died, and she owned a small place there; her mother lived in Mena, Polk County, Arkansas, and she was at Mena, taking care of her mother, when these troubles commenced. Respondent Simon N. Heath resided in Kansas City; he had a sister, Ova Standridge, who operated a beauty shop in Mena, Arkansas. Simon, his wife

Cannie, and his sister Ova, owned some cosmetic formulas and, at Kansas City, toyed at least with the manufacture of cosmetics, and Ova did likewise at Mena. Appellant became acquainted with Ova at Mena; was at the beauty shop on occasions; finally decided that she wanted to get into the cosmetic business, and three of the deeds involved were executed by her in getting into this business.

The three deeds were executed at Mena, the first on an Arkansas printed form, June 1, 1944; this one was prepared by J. S. Kelly, a notary and abstracter at Mena. By this deed appellant, for the recited consideration of "one dollar and other valuable considerations", conveyed her house and lot to "S. N. Heath Products." Simon testified that appellant executed this deed "for the purpose of becoming a partner in the S. N. Heath Products"; that the S. N. Heath Products was "a label we were using that was made in Kansas City"; that S. N. Heath Products was owned by himself, his wife, his sister Ova, and appellant after the execution of this deed. He also testified that Ova had no interest in S. N. Heath Products. Simon ascertained that he could not borrow money on the house and lot with the title in S. N. Heath Products, so at his direction, appellant executed the second deed, dated June 24, 1944, on a Missouri printed form, signed and acknowledged before Notary Kelly in Mena, June 26, 1944; the consideration recited was "one dollar and other valuable consideration"; the grantees were Simon N. Heath and Birdie Heath, the appellant. In other words, appellant, by the second deed, conveyed the lot to Simon and herself. The second deed recites that it was "made to correct and supplement a previous deed by grantor herein dated June 1, 1944, to S. N. Heath Products; said S. N. Heath Products is a partnership comprising the grantees herein as sole partners". It will be noted that Simon testified that S. N. Heath Products, after appellant got in, was a partnership composed of himself, his wife, his sister, and appellant.

The second deed was unsatisfactory to Simon, so the third deed was executed. The third deed was on a Missouri printed form; dated June 24, 1944, same date as the second; the grantors were "Simon N. Heath and Cannie Heath, his wife, of Jackson County, Missouri, and Birdie Heath, a single woman, of Polk County, Arkansas, individually and as partners doing business as S. N. Heath Products". It will be noted that the personnel of the "S. N. Heath Products" changed again. The second and third deeds were prepared in Kansas City by Simon, or at his direction, and mailed to Mena; no grantee was named in the third deed when appellant signed and acknowledged it; Simon inserted, or caused to be inserted, after the deed was returned to him, the name of "Joseph L. Leone, a single man". The third deed was acknowledged by appellant before Notary Kelly in Mena on June 29th, and by Simon and his wife in Kansas City on June 30th. On same day, June 30th, Leone conveyed the

house and lot to Simon N. Heath. It is conceded that Leone was a strawman. Simon's explanation to appellant for wanting the second and third deeds was that the first deed, on an Arkansas printed form was illegal. He testified: "I wrote and told her if she wanted to go into the business to make me a Missouri deed so it would be legal." The four deeds above mentioned are involved, but plaintiff in the prayer of her petition asked only that the "transfers to the said Simon N. Heath be vacated, set aside and held for nought". But the case was tried as if appellant were seeking to set aside the four deeds, and when the deeds were introducd in evidence it was stated by counsel, "We would like to offer in evidence the deeds which we seek to set aside".

Shortly after Simon got title to the house and lot by the deed from Leone he obtained a loan thereon for $2,000.00 from a building and loan association in Kansas City; paid off a small loan that appellant had on the place; had $1665.35 remaining. After the loan was obtained Simon, his wife Cannie, his sister Ova, and appellant, under the partnership name of "Heath-R. Cosmetic Mfg. Co." opened for business in Mena in a building owned by the sister Ova. July 20, 1944, appellant and Simon and his wife signed, in Mena, a paper which we may term *the stock exchange agreement,* which agreement recited that appellant had "sold and traded her equity and part interest of the S. N. Heath Products property in Kansas City, Jackson County, Missouri, which consisted of five shares valued at $5,000.00, for five shares in the Heath-R. Cosmetic Mfg. Co., valued at $5,000.00, located in Mena, Polk County, Arkansas". Simon testified in the Arkansas case (see infra) that appellant *had an interest* in her house and lot until the execution of the stock exchange agreement which was nearly a month after all the deeds were executed.

December 16, 1944, Simon, his wife, his sister, and appellant signed what was termed a "partnership agreement". The partnership name used was "The Heath Cosmetic Manufacturing Company". Simon testified that the Heath Cosmetic Manufacturing Company was the same partnership as the Heath-R. Cosmetic Mfg. Co. Ova and appellant did not get along too well, and the business, shortly before the execution of the written partnership agreement, was moved from Ova's building at 606 Mena Street to 715 Mena Street; the new location was small and only "one batch" of cosmetics was manufactured at the new location. In the written agreement Simon was named president, his wife secretary, Ova, the sister, treasurer, and appellant was to be factory manager. The interests of the partners were: Simon, 25 shares; his wife, 25 shares; the sister Ova, 25 shares; appellant, 5 shares; the same interests were held by the partners prior to the written agreement. The agreement recited that "there shall be 20 shares of the stock for sale to anyone who may desire to

purchase the same''. So far as appears no other ''Birdie'' appeared to purchase.

The Heath Cosmetic Manufacturing Company, in addition to ''the manufacture, sale and distribution of cosmetics'', handled women's ready to wear; Simon said that he invested the amount realized from the loan on the house and lot in question in women's ready to wear merchandise for the store in Mena; that the merchandise he purchased and shipped to the store in Mena amounted to $2143.75. It appears that in July, 1944, Simon purchased, for the Mena store, from a women's ready to wear company in Kansas City merchandise amounting to $1143.75, and it also appears that on July 22, 1944, Simon, his wife, and Ova, the sister, borrowed $1000.00 from a bank in Mena. It also appears that the store in Mena, sometime prior to December, 1944, sustained a fire loss and that Simon collected the insurance amounting to $1028.19.

The fortune anticipated by appellant did not come; Simon and Ova were packing the merchandise on hand to ship to Kansas City, and appellant, on May 3, 1945, after being in the partnership some nine months, filed suit in the chancery court of Polk County, Arkansas, for dissolution of the partnership, and whatever merchandise the sheriff found was impounded. A master in chancery was appointed; evidence taken, report made and approved, and a decree rendered November 14, 1945; the partnership was dissolved. It was found that the partnership owed appellant $1665.35, the net derived from the mortgage loan on her house and lot; that after certain adjustments of her obligations to the partnership there was a balance due her from the partnership of $1561.39, and judgment for that amount was rendered in her favor and against the partnership. It was found that Simon owed the partnership $781.70, and Ova, his sister, owed the partnership $212.40. Appellant received $675.00, less the costs of the suit (amount not shown) from the registry of the Polk County chancery court. It might be inferred that the costs in the Arkansas case were around $300.00. The $675.00 was derived, as we infer, from the disposition in bulk of fixtures and ready to wear when Simon and Ova were getting ready to ship to Kansas City before the suit for dissolution was filed; the $675.00 was paid after the dissolution suit was filed and went into the registry of the court. At a sheriff's sale of impounded partnership property, appellant became the purchaser on a bid of $1000.00 which amount was credited on her judgment of $1561.39; and we infer that whatever amount she received out of the $675.00 was also credited on her judgment.

Appellant contends, as stated, that the conveyances she made of her house and lot were intended at the time by her and by Simon to be mortgages and not deeds; that she did not intend to convey her house and lot for keeps, but that the purpose was to place the

title in Simon so he could borrow the money to pay for her interest in the partnership. On the other hand respondents contend that appellant exchanged outright her house and lot for the five shares in the S. N. Heath Products and that these five shares were later exchanged, by the stock exchange agreement of July 20, 1944, for five shares in the "Heath-R. Cosmetic Mfg. Co." which took the name, The Heath Cosmetic Manufacturing Company when the partnership agreement was reduced to writing December 16, 1944. Respondents introduced in the present case the original file in the cause to dissolve the partnership in the chancery court of Polk County, Arkansas, and that entire file, including depositions, is before us here and the facts stated here are in part from that file.

The evidence tending to support appellant that her deeds were intended to be mortgages only may be stated as follows: (1) In the present case she testified: "I thought the deed I executed June 1, 1944, to S. N. Heath Products was a mortgage; I never read it; Mr. Kelly (the notary in Mena) presented it to me; I thought the subsequent deeds I signed were mortgages; I never received any money for any of the deeds. I signed the deeds because they (the other partners) didn't have any money to put in; I wanted to go in business and I thought I would mortgage that property; I had no intention of parting with my title; that is my home"; (2) the master in chancery in the Arkansas case found (the finding was approved by the court): (a) That "the purpose of these deeds was that the property could be mortgaged to raise money for the benefit of the partnership"; (b) that "no money was paid into the partnership except the $1665.35 realized from the mortgage (by Simon) on the Birdie Heath property"; (c) that "Simon Heath evidently thought that he could, by having Birdie Heath sign this statement (the stock exchange agreement of July 20, 1944) divest her of all her interest in the money (the $1665.35) that he had received just a few days before by execution of a mortgage on Birdie Heath's home; Birdie Heath received no consideration for the execution of the agreement"; (3) in the report the master said: "I think that she (Birdie) has an equity in the property (the house and lot in Kansas City), and if it were within the jurisdiction of this court, I would recommend that Simon Heath, Cannie Heath, and the Heath Cosmetic Company be divested of all interest in the property, and that the title be restored to Birdie Heath, subject of course to the mortgage lien" (placed by Simon); (4) the facts that the first deed was to S. N. Heath Products, the second to Simon and appellant, and in the third no grantee was named when appellant signed and acknowledged, ▬▬ are invoked by appellant as circumstances tending to corroborate her claim that she did not intend and that Simon knew she did not intend to exchange her entire interests in her house and lot for the five so-called shares in the S. N. Heath Prod-

ucts partnership, whatever that was; and (5) that Simon himself testified that appellant had an interest in the house and lot until she signed the stock exchange agreement of July 20, 1944.

The evidence to support respondents' claim that appellant exchanged outright her house and lot for the five shares interest in the S. N. Heath Products was Simon's evidence, that of his sister Ova, and the evidence of appellant herself when giving her deposition in her suit in Polk County, Arkansas, for dissolution.

Simon testified: "My sister (Ova) told me about Birdie Heath wanting to come into the business; we came to an agreement that she was to have five shares; for the five shares she was to pay her house. I had seen the place; it was in bad condition; hadn't been painted for several years; it was a rented house and things were out of order as they usually are. Shortly thereafter she traded (the stock exchange agreement) her interest in that partnership (S. N. Heath Products) for the interest in another partnership (Heath-R. Cosmetic Mfg. Co.) in Arkansas." He testified that they (himself, appellant, and Ova, as we understand), when the first deed was executed, sat in Notary Kelly's office in Mena, and discussed the deal; that Kelly drew the deed; that Kelly said to appellant, "Birdie, you know you are selling your house for this cosmetic business", and that she said, "Yes, I am".

Ova testified that in Mena, Birdie was going down the street; that she "stood and admired the flowers" that she (Ova) had in her beauty shop; that she gave Birdie a flower, the one that she particularly admired; that from that time Birdie was a frequent visitor at the shop; would stay for an hour or longer; such went on for months; that Birdie knew "I had a very prosperous business and kept asking and inquiring if I would like to have her" in my business; "she wanted to acquire an interest in my business"; that at that time "I wasn't interested because I had all the business I needed"; that "later I decided I would start manufacturing cosmetics which I did with my brother" (Simon); that Birdie asked her "any number of times" to sell her an interest in the beauty shop; "I told her that I didn't think that I would"; that then she wanted to know "if I would let her in the cosmetic business, but I told her I didn't want to"; that "I was with my brother in Kansas City and we was manufacturing cosmetics. While I was there (Kansas City) she called me long distance and wanted to know if I wouldn't get my brother to let her in with us. At that time my brother wasn't interested because he had about all we could do, but she was the kind of a person that I wanted to help because I had previously had a lady who wanted to come in with me, a lady who had the money. I knew that the woman that had the money didn't need any help, but I did think that Birdie might need help and I would consider it. Q. What was said about how she could pay for an interest in the business? A.

Well, she said she had some property that was an expense to her in Kansas City that she would like to trade as her interest in the cosmetic business with me".

Ova further testified that she and Birdie never got around to a deal; that Birdie made a second call to Kansas City, and that Simon said, "Well, why don't you take her into the company if it will help her". So "we talked about it and we realized that we could do better by going ahead as we had it, since we had the stuff ready to start selling wholesale, but the next time she called I told her we could sell her an interest in it, which we did. Q. How many shares did you (Simon and Ova) sell her? A. Sold her five shares. Q. What did she pay for them? A. She deeded that house, her place. Q. Were you along when these various papers were signed? A. I was. Q. And did Mr. Kelly (the Mena notary) explain to Birdie Heath what the paper was she was signing? A. Yes, he did. He said to Birdie, 'Do you know you are signing your home in Kansas City over for this property'? She said, 'I understand that, but I am going to get rich off of it'. . . . Q. Did she read over the paper she signed? A. Yes. . . Q. None of these deeds were made to you? A. Indeed not. Q. You didn't get a dime of Birdie's property, did you? 'A. No, I didn't. Q. You were a member of the partnership all the time? A. That's right. Q. But your name was never put on a deed? A. All I put up was my experience; I didn't get anything from that, you see. I just obtained 25 shares. Q. In other words, Simon is the only one who got Birdie Heath's property? A. He was the one that was understood to get it in the beginning". The inference is plain that Simon and Ova reluctantly(?) consented for appellant to "come in", and that the real purpose was for Simon to get her house and lot.

In her deposition in the Arkansas case, in evidence in the present case, appellant testified: "Q. Mrs. Heath, did you and Mr. and Mrs. S. N. Heath engage in the business of manufacturing cosmetics beginning in June or July of 1944 and continue up to the time you filed this suit? A. Yes. Q. Did you pay anything for your interest in that business? A. I paid my piece of property in Kansas City—$5000.00 value. Q. Had you had it looked at by real estate men, and did you know what the value of that property was at that time? A. Yes. Q. What was its value? A. Five thousand dollars. . . . Q. Did you make a deed to that property? A. Yes, sir. Q. To whom? . A. To Simon Heath and his wife and myself. Q. What was the purpose of that deed? A. Well, I was paying for my part in the business. Q. By the 'business' you mean Heath Cosmetic Manufacturing Company? A. Yes, sir. Q. When you made the deed were you paying for your stock in the organization? A. That was what I was putting into my stock. . . . Q. Mrs. Heath, at the time you decided to dissolve this partnership and file this suit,

had you heard the defendants, Simon Heath and Ova Standridge, say or estimate what merchandise was on hand at the time you filed suit to dissolve this partnership? A. Yes, sir. Q. Did they say they knew of their own personal knowledge what the value of the properties on hand was? A. *Seventy-five thousand dollars* (italics ours). Q. Did you hear that under discussion while you were still with the partnership—while you were still active in it? A. Yes, I did. Q. State whether, in your opinion, that would be a fair estimate of the value of the properties belonging to the partnership? A. Yes, sir, it was. . . . Q. What was this $75,000.00 worth of property? A. Well, it was the Heath Cosmetics. Q. I know, but was that real estate, was it face powder, or what was it? A. It was the Heath Cosmetic stuff. Q. I want to know what that consisted of, Mrs. Heath. A. Well, it was talcum powder, face cream, hand lotion, shampoo, lipstick and everything like that.''

There appears in the file here what appears to be carbon copies of two typewritten letters from appellant to Simon. One is dated June 24, and the other June 29, 1944, the dates, respectively, on which appellant signed and acknowledged the second and third deeds. The letter of June 24, addressed to Simon Heath, Kansas City, Missouri, is as follows: ''I have signed and enclose to you the deed (second deed) in which I am deeding lot 40, Munroe Heights, Kansas City, to you and ▆▆▆ myself as partners. This deed states that it is a correction deed, correcting the deed made to Heath Products, dated June 1, 1944. In view of the fact that the other deed (third deed) enclosed names no grantee and has the appearance of a transfer in blank of this property, I am returning it unsigned pending a full explanation as to its intent and the reason for such a deed. You will please remember that I do not wish this house rented to anyone with children. My address is 702 Janssen Avenue, Mena, and if I am needed for anything very badly I will try to get up there. As to any repairs on my house, you will please let that go until I am on the ground to look after it myself and talk it over with you.''

The letter of June 29 concerns the third deed, the grantee blank deed, sent back to Simon with the letter of June 24, and is as follows: ''I have signed the other deed (which is written in blank) and am sending it along to you. I do not know what this is for and it is not self explanatory. I am merely trusting this to you and your honor. I cannot possibly leave here now; my mother had two bad spells yesterday—heart trouble, and of course I cannot leave. Take care of the business and of this thing and go ahead; I am counting on you.'' The record shows that C. J. Kelly, the notary who took appellant's acknowledgment to the deeds she signed, is an abstracter in Mena; that the deeds were signed in his abstract office; and the carbon copy of each of these letters is on the back of what ap-

pears to be an abstract transfer sheet. It might be surmised that Notary Kelly wrote these letters for appellant.

The present cause was tried February 27, 1948, and taken under advisement; June 9, the court rendered judgment for defendants; June 18, motion for a new trial was filed; July 10, the motion was taken up, argued and overruled. At the hearing on the motion Mr. Colvin, counsel for appellant, called the attention of the court to the two letters set out above; read them to the court; the court asked counsel, "How does it happen that that evidence (the letters) was not produced"? and Mr. Colvin stated that the letters "were mixed up in some way" with appellant's papers; that he did not know about them in time for the motion for a new trial. Counsel for respondents (Mr. Schultz) called attention to the fact that there was no allegation in the motion on newly discovered evidence. These letters were not in evidence and we do not count on them in reaching our conclusion in this cause.

Appellant in her petition alleged that the purpose of her deeds "was to place said property and the title thereto in such position that the same could be used as collateral for the purpose of obtaining money" to finance the Arkansas partnership; that the purpose in naming Simon as a grantee was to deliver the property to him "in trust for the grantor"; that the trust was violated; that no consideration passed between Simon and plaintiff; "that for said reasons" the deeds should be set aside "subject to any existing mortgages which may be held by any innocent holder".

The evidence is convincing that appellant never intended to exchange her house and lot for the so-called five shares. It is quite apparent that all she got out of her venture was grief, and it is equally apparent that all that respondents put into the partnership was mere moonshine. Ova frankly admitted that all she put into the partnership was her experience, the use of a few cosmetic formulas, and $16.00 in money; she said that she owned 500 formulas that she valued at $5,000,000.00. Simon said that he put in money, time, experience, cosmetic formulas; he testified that he had "a knowledge of a formula which would take blemishes, freckles, pimples, discolorations, and cysts off"; he said that "we had some offers of $1000.00 per share" for the partnership stock, but he did not say who made the offer or when, and when pressed to place a value on his formulas about all he would say was that "they were worth whatever they can be sold for", and finally said that he "might not give anything for them". He ▮▮▮▮ testified, too, that he invested "in the Heath Cosmetic Manufacturing Company, about $1130.07"; that he made this investment "while Birdie (appellant) was trying to get those deeds fixed up and get the loan on the place"; he did not say what was purchased with the money; he said that the record he kept in his notebook showed that "the stuff I sent down" to Mena

amounted to $1130.07; but the master in chancery found that about all that was in the Mena store, and the only place where appellant participated, was derived from the $1665.35 realized from the loan on the Kansas City house and lot. All of Simon's formulas, whatever they were worth, were released to him by the Arkansas chancellor.

Where there is, in an equity case, irreconcilable and directly conflicting verbal evidence on fact issues before the trial chancellor it is the general rule to defer to the chancellor's finding because of his better opportunity to determine credibility, unless the overwhelming weight of the evidence is contrary to such finding. Steinhoff v. Kinder et al. (Mo. Sup.), 186 S. W. (2d) 600, l. c. 602, and cases there cited; Fountain et al. v. Fountain (Mo. Sup.), 190 S. W. (2d) 941; Botto v. James (Mo. Sup.), 209 S. W. (2d) 256. There is, in the present case, irreconcilable conflict between the evidence of appellant on the one hand and Simon and Ova on the other as to the purpose of appellant's deeds, but there is no conflict as to what appellant got, and it can hardly be said that there is any conflict in the evidence respecting the deception as to fabulous values of formulas. The record here, which includes the record in the Arkansas case, abundantly establishes that appellant got just *nothing*. After she was *in* a part, at least, of the $1665.35 derived from the mortgage on her house and lot was invested in the ready to wear. Ova put in $16.00 and permitted the use of a few of her formulas; Simon put in just *nothing,* as the record reflects. As to his formulas, he said, in effect, as stated, that they were worthless. The manner in which Simon finally obtained title to appellant's house and lot speaks for itself.

Respondents in the brief say that "it is of striking significance" that such terms as fraud, undue influence, confidential relations, imposition, overreaching, "and the like" nowhere appear in the petition. The evidence went far afield from the petition. Sec. 82 of the new code (Sec. 82, Laws 1943, p. 378) provides, among other things, that "when issues not raised by the pleadings are tried by express or implied consent of the parties they shall be treated in all respects as if they had been raised in the pleadings". Prior to the new code the same rule in principle prevailed. See Ilgenfritz v. Missouri Power & Light Co., 340 Mo. 648, 101 S. W. (2d) 723, l. c. 726; and cases there cited. The record reflects that appellant is uneducated, without business experience; and the inference is clear that she was taken in by the fabulous valuation placed on worthless cosmetic formulas. Ova passed up, so to speak, a woman who had money in order to *favor* appellant.

The general rule is that a voluntary conveyance, one without any valuable consideration, is valid as between the parties. Binnion v. Clark et al., 359 Mo. 202, 221 S. W. (2d) 214, and cases there cited.

It is stated in the Binnion case that "in all instances in which conveyances have been set aside there has been some other compelling circumstances in addition to mere inadequacy or lack of consideration". But there is much more here than lack of consideration; there is definitely evidence of fraud; breach of trust and deception.

It is not necessary to further extend this opinion. The judgment should be reversed and the cause remanded with direction to set aside the four deeds subject to any innocently held deed of trust executed by Simon. It is so ordered. *Dalton* and *Van Osdol, CC.*, concur.

PER CURIAM:—The foregoing opinion by BRADLEY, C., is adopted as the opinion of the court. All the judges concur.