State of Missouri ex rel. J. E. Taylor, Attorney General, Respondent, v. Paul H. Anderson and L. C. Fritts, Appellants, No. 42510—254 S. W. (2d) 609.

Division One, February 9, 1953.

*Lincoln, Lincoln, Haseltine & Forehand, H. T. Lincoln* and *Turner White* for appellants.

886

*J. E. Taylor*, Attorney General, *Robert R. Welborn* and *William A. Wear*, Assistant Attorneys General, for respondent.

COIL, C.—Appeal from a judgment in an action by the Attorney General to prevent and restrain defendants from violating the law relating to monopolies, discriminations, and conspiracies contained in Chapter 416, Mo. R. S. 1949. (References to statute sections are Mo. R. S. 1949).

The suit under §416.260 for injunctive relief, alleged in count I that defendants entered into an agreement or understanding with four corporations to regulate, control, and fix the resale price of liquid petroleum and to maintain the price so fixed and regulated; entered into such agreement or understanding for the purpose of lessening free competition and to increase the market price of liquid petroleum, and that such agreement or understanding did tend to lessen free competition and to increase the market price; and that such agreement or understanding was in restraint of trade and competition. The averments of count I are based upon the provisions of §§416.010, 416.020, and 416.040.

Count II of the bill averred that defendants combined with four corporations for the purpose of destroying the competition of another corporation and discriminated against it by selling liquid petroleum in one city or area of the state at a different price than it was sold by defendants in combination with the four corporations in another city or area of the state. These averments were based upon §416.120. As will later appear, we eliminate the question of violation of this section (416.120) from consideration. Thus, further reference herein to the "sections of the statutes" or to the "statutes" will refer, unless otherwise noted, to §§416.010, 416.020, and 416.040.

The trial court's judgment found defendants guilty of a conspiracy in restraint of trade and permanently restrained and enjoined them from participating in any agreement or understanding for the purpose of fixing the resale price of liquid petroleum, and from participating in any agreement or understanding to discriminate against a competitor by selling liquid petroleum in one city for a lower price than liquid petroleum is sold by defendants in another city.

The sections of the statutes here involved (for the purposes of this case) provide in substance as follows: §416.010—that any person who enters into an agreement or understanding with any other person in restraint of trade or competition is guilty of conspiracy in restraint of trade; §416.020—that any person who enters or participates in an agreement or understanding with any other person to regulate, control, or fix a price, or to maintain such regulated or fixed price, is guilty of conspiracy in restraint of trade; §416.040—that agreements or understandings between two or more persons which are designed to lessen [612] or which tend to lessen free competition, or agreements which are designed to increase or which tend to increase the market price of any commodity, are against public policy, unlawful and void, and that any person participating in such an agreement is guilty of conspiracy in restraint of trade; §416.120 provides that any person engaged in the sale of a commodity who with intent to destroy, and for the purpose of destroying, competition of an established dealer in such product or commodity, discriminates by selling the commodity in one town at a lower price than he sells it in another town, having regard for different cost factors, is guilty of unfair discrimination which is prohibited and declared unlawful.

Section 416.050 provides for fine or imprisonment or both for one convicted of violating the provisions of §§416.010, 416.020, and 416.-040. While the assessment of penalties was prayed in plaintiff's bill, no penalties were assessed by the trial court. Obviously, penalties could not be assessed because this is a civil proceedings in equity by virtue of §416.260 and not a criminal proceedings under §416.050.

The evidence adduced by the Attorney General tended to establish that defendants are partners doing business as Economy Gas Company

with their principal office in Springfield, Missouri, and sell liquid petroleum (propane and butane gas) in and about the City of Springfield; that in September 1950 defendant Fritts, in company with a representative of each of three corporations which also sold liquid petroleum in Springfield, visited one Kenneth Coatney at the offices of the Lebanon Propane Gas and Appliance Company, a corporation, in Lebanon, Missouri; that Coatney controlled and managed the Lebanon Propane Gas and Appliance Company, and was president of the Ken L. P. Gas Company, a corporation whose principal office was in Springfield, and that both the last named corporations sold liquid petroleum in Lebanon and Springfield respectively; that Fritts, as spokesman for himself and those with him, told Coatney that since he, Fritts, and defendant Anderson had bought the Economy Gas Company (September 1949), "they had all got together and organized a group which had set the price on gas and they would get that price the year round"; that they were getting 12¢ and 14¢ per gallon in Springfield and Lebanon for gas, and requested that Coatney raise his price to theirs; that one or two of the others with Fritts also told Coatney that they all had the same price; that Coatney, through the Ken L. P. Gas Company, was then selling liquid petroleum in Springfield for 9-½¢ and 10-½¢ a gallon depending on the amount sold; that Fritts remonstrated with Coatney about undercutting others on price and told Coatney that the others would lose money if they had to meet his price and they did not intend to do so; that if Coatney refused to go along with them they would contribute money to a fund and run Coatney out of business; Fritts said it would be cheaper to contribute to run Coatney out of business than to take the loss which would result from selling at Coatney's price; that Fritts suggested they buy out Coatney in Springfield, which proposition Coatney refused; that someone asked whether Coatney would leave Springfield if Missouri Hydro Gas Company, a representative of which was present in the meeting, ceased doing business in Lebanon; that Coatney said he would consider this; that Fritts said they would discuss the matter with Mr. Bales, one of the owners of the Missouri Hydro Gas Company, and let Coatney know; that after the other parties present had left the meeting, Fritts told Coatney that they would see what could be worked out, but that the "boys really meant business"; that this meeting lasted about three hours and that many of the statements made by defendant Fritts were repeated in various forms at numerous times during the meeting.

Several days later, probably September 22, 1950, defendants Anderson and Fritts called on Coatney at his office in Lebanon and Fritts stated that they (identified as "the group") were going to put 5¢ gas in Lebanon and run him, Coatney, out of business if he didn't come to terms, that they had all talked it over and had discussed several plans but had decided on the plan to put 5¢ gas in Lebanon as most

effective; that Fritts again requested that **[613]** Coatney raise his price; that Anderson told him (Coatney) that he was "a bull-headed fool for not coming along with the group"; that Coatney told them he would think it over and let them know by a certain day; that they said if he didn't come to terms there would be 5¢ gas in Lebanon until he did come to terms.

Of the four corporations with whom defendants are charged to have agreed, only Missouri Hydro Gas Company sold bulk liquid petroleum in Lebanon or in the "Lebanon area". On October 2, 1950, Missouri Hydro Gas Company advertised in a daily paper in Lebanon offering propane and butane gas for sale at 5¢ per gallon at any place within a 10-mile radius of Lebanon, and continued to so offer for about 30 days.

Defendants Anderson and Fritts again visited Coatney in Lebanon at a later time, probably October 17, 1950, and Anderson said to Coatney: "We are taking all of your customers up here and we are just going to run you out of business" and "instead of just having gas within ten miles of Lebanon, we will have it everywhere your bulk truck runs and you won't make a cent on your gas as long as you are in business." This third meeting lasted about an hour.

Essentially all the foregoing evidence was adduced through the testimony of Coatney. Coatney's wife, his secretary, and a salesman in the retail store of the Lebanon Propane Gas and Appliance Company, who were present in the store when certain of the conversations heretofore referred to took place, testified that they overheard parts of those conversations and corroborated the testimony of Coatney to a certain extent. Kathryn Coatney, the wife, testified that she heard Fritts ask Coatney to raise his price in order to meet the prices which they "had set." The bookkeeper heard Anderson or Fritts tell Coatney that if he didn't meet their price, all the companies were going together and see that Coatney "didn't make a nickel on a gallon of gas." The salesman said that he had heard a discussion during the original visit of Fritts and the representatives of the other companies concerning the price of gas and heard them ask Coatney to go along with them.

Defendants adduced evidence consisting of the testimony of themselves and of the representatives of the corporations who were present at the first meeting with Coatney, and of other officers and representatives of the various corporations with whom it was charged defendants agreed and combined. This testimony directly contradicted the testimony of Coatney as to what occurred and was said at the three meetings. All of defendants' witnesses, including defendants, denied that there was ever any sort of an agreement or understanding to fix, control, or regulate prices or to maintain prices, or any attempt to coerce Coatney in any manner, or any request made that he raise his prices to meet theirs, or that any threat of any kind was

made concerning 5¢ gas in Lebanon or otherwise; that no one other than Missouri Hydro Gas Company and its president and manager knew of the fact that Missouri Hydro Gas Company was to offer propane and butane at 5¢ a gallon on October 2 or at any other time; that such was done solely for the purpose of stimulating sales and not as a result of any agreement or understanding, tacit or otherwise, and not for the purpose of, or with the intent of, eliminating or lessening the competition of Coatney's company or companies.

Defendants Anderson and Fritts explained the original visit of Fritts and the other representatives of gas companies to Coatney and the subsequent visits of Fritts and Anderson to Coatney by stating that their sole purpose was to ascertain from Coatney his true intent with reference to his operation in Springfield, and to find out why Coatney was selling gas at so low a price; that they had learned that Ken L.P. Gas Company was selling liquid petroleum for as little as 8¢ a gallon in Springfield; that to meet this competition would be ruinous to defendants; that they were consequently much concerned; that they had understood that Coatney, who had begun business in Springfield in the summer of 1950, was there on a temporary basis in an attempt to, and for the purpose of, "hurting" Missouri Hydro Gas Company; [614] that later they suspected Coatney might intend to stay in Springfield permanently and thus they wanted to ascertain just what Coatney intended to do and why he would sell, and how long he intended to continue to sell, at the price of 8¢ and 9¢ in Springfield.

The evidence showed that the prices at which defendants sold liquid petroleum in Springfield, viz., 11¢, 12¢ and 14¢ per gallon in September and October, 1950, were the same prices in effect at the time defendants bought the business of Economy Gas Company in September 1949; that those same prices were continued in effect from the time defendants entered business in Springfield until December 16, 1950, when a price increase was made due to an increase in price by their supplier and other increased costs. Prices charged by the other Springfield companies, with whom defendants are charged to have had an understanding, varied during 1950 from 10¢ to 15¢ per gallon depending on the amount sold and the particular period covered. An analysis of the testimony as to prices charged for liquid petroleum by the defendants and the four corporations with whom they are charged to have agreed to fix prices, discloses that there was some uniformity in that the minimum and maximum price of each company for the periods in question were about the same. Nevertheless, the only evidence in the record tends to show that liquid petroleum is a standardized product; that the cost to all Springfield companies was about the same, that the costs of handling and distribution were about the same, and consequently that a certain uniformity of price

would undoubtedly prevail irrespective of any agreement or understanding as to fixing, controlling, regulating, or maintaining prices.

Defendants contend that there is a failure to prove by clear and satisfactory evidence that they violated the statutes heretofore mentioned. They point out that the fact alone of uniformity of prices is not evidence of a conspiracy to fix prices where the product is standardized; that reduction of price to stimulate sales is a proper practice; and contend that admissions of defendants are not alone sufficient to establish a conspiracy and may be considered only after the conspiracy has been established by evidence other than defendants' admissions; and further contend that the evidence is as consistent with an inference of innocence as with an inference of guilt.

It is clear from the foregoing review of the evidence that whether there is substantial and convincing evidence to support the trial court's findings and judgment depends entirely upon whether the testimony of Coatney is believed. While there are other circumstances in evidence, those circumstances alone or together would not be sufficient to show a violation by defendants of the statutes involved. That is to say, the fact of uniformity of prices in Springfield, in the absence of any showing that this uniformity was the result of an artificial condition and did not result naturally from standardized costs in the purchase, handling, and distribution of the item, would not be sufficient evidence from which to infer any agreement or understanding to fix, control, regulate, or maintain prices. Pevely Dairy Co. v. U.S., 8 Cir., 178 F. 2d 363, 366 [5]; United States v. Standard Oil Co. of New Jersey (E.D.Mo.), 47 F. 2d 288, 316, 317. Likewise, the fact that Missouri Hydro Gas Company did, on October 2 and for approximately thirty days thereafter, sell gas in Lebanon for the price of 5¢ per gallon would not be sufficient alone, or in combination with the evidence of uniformity of prices, to furnish a substantial basis for an inference that an agreement as to price existed. Nor is the circumstance that defendants and the representatives of three other corporations visited Coatney on one occasion to talk about price and Coatney's intent, nor is the circumstance of two other visits to Coatney by defendants alone to pursue the same subject matter, even if those two circumstances are added to the others mentioned, sufficient evidence to establish the existence of an agreement or understanding as to price.

On the contrary, it is clear that no violation of the provisions of the statutes noted is shown unless the testimony of Coatney, as corroborated in a limited way by his wife, his secretary, and his salesman, [615] is accepted as true. But if the testimony of Coatney is believed, despite the direct contradiction of all essential parts thereof by defendants' evidence, and the other circumstances are then considered, there was substantial evidence from which the trial court could properly find that a violation of the statutes in question occurred.

▉ The trial court concluded that the degree of proof to establish the charge made was such as to "induce belief and convince the mind of the trier of the facts."

Appellants contend plaintiff has the burden to prove the guilt of defendants by clear and satisfactory evidence, citing in support: State ex inf. Crow v. Continental Tobacco Co., 177 Mo. 1, 75 S.W. 737; State ex rel. Barrett v. Carondelet Planing Mill Co., 309 Mo. 353, 274 S.W. 780; and State ex inf. Hadley v. Standard Oil Co., 218 Mo. 1, 116 S.W. 902. Each of those cases is a quo warranto proceedings. This is not a quo warranto proceedings. However, it is a proceeding for injunctive relief in which, as a basis therefor, violations of the so-called antitrust statutes must be proved. We find no case in this state in which an individual has been proceeded against in equity under §416.260. We have no doubt, however, that a violation of these statutes must be established by clear and convincing evidence and that clear and convincing evidence must certainly be more substantial evidence than that which is only sufficient to submit a case for the consideration of a jury. There must be substantial evidence of a kind and character which is clear and convincing as to the existence of the ultimate fact to be proved.

▉ Coatney testified to statements made by defendants which, if true, constituted evidence that an understanding existed among defendants and other companies in Springfield to control, regulate, and maintain prices. These voluntary statements of defendants are in the nature of admissions against interest. They were statements of facts rather than of opinions. Extrajudicial admissions are, of course, admissible in evidence and are competent as evidence of the existence of the facts which they tend to establish. Concrete Steel Co. v. Reinforced Concrete Co., Mo. App., 72 S. W. 2d 118, 120[2-5]; Tappe v. Pohlmann, Mo. App., 79 S. W. 2d 485, 488[5]; 31 C.J.S., §273, p. 1027.

Of course, the effect to be given and the construction to be placed upon an oral admission depends upon the circumstances under which it was made, and a consideration of all that was said at the time of the admission. 31 C.J.S., §277, p. 1029. Here the admissions were voluntary statements admitting directly and unequivocally the ultimate essential fact to be proved.

The rule suggested by appellants, that a confession or admission of guilt is insufficient to prove a crime without independent proof of the corpus delicti, has no application for the obvious reason that this is a civil and not a criminal proceedings.

▉ We have pointed out that the circumstances heretofore referred to, independent of defendants' admissions, were insufficient to furnish a substantial basis for a finding of a violation of the statutes referred to. However, the court could properly consider these circumstances in determining the credibility of the testimony by the witness Coatney.

The trial chancellor believed the testimony of Coatney and disbelieved the testimony of defendants and the other witnesses adduced by defendants in direct contradiction of Coatney's testimony.

This being a suit in equity, we review the case de novo, weigh the evidence, and determine on the whole record what relief, if any, should be granted. Where, as here, however, there exists an irreconcilable conflict in the evidence on the essential fact issue involved, depending for determination on the credibility of witnesses, a situation prevails wherein the application of the rule of deference to the findings and conclusions of the trial chancellor is especially appropriate and necessary. Heath v. Heath, 359 Mo. 590, 600[1], 222 S. W. 2d 778, 785[1]; Gardine v. Cottey, 360 Mo. 681, 693, 230 S. W. 2d 731, 738[2]. The trial chancellor's opportunity to observe the witnesses and to hear them testify [616] affords him a basis for determining the credibility of testimony which we do not have. A review of the entire record in this case convinces us we should defer to the trial court's conclusion that the testimony of Coatney was true. Based upon a full review of the record, we hold that the testimony of Coatney, accepted as true, together with the other circumstances in evidence, constitutes substantial and convincing evidence of a violation by these defendants of the provisions of the statutes here considered. Johnson v. J. H. Yost Lumber Co., 8 Cir., 117 F. 2d 53, 57[3].

Accepting Coatney's testimony as true and then considering it with the other circumstances shown in evidence, there is convincing evidence in the record to establish these facts: that visits to Coatney were made by defendants, at one time in the company of other sellers of liquid petroleum, for the purpose of discussing the intent of Coatney with reference to prices of liquid petroleum in Springfield; that there was uniformity of prices of liquid petroleum in Springfield among defendants and some other sellers; that defendants said there was an agreement among them and other sellers of liquid petroleum in Springfield to at least regulate, control, and maintain uniform prices; that defendants threatened to destroy Coatney's Lebanon business unless he joined in an agreement to sell in Springfield at the controlled and maintained prices charged by defendants and certain other Springfield sellers; that upon the refusal of Coatney to so agree, Missouri Hydro Gas Company offered for sale propane and butane gas in Lebanon and within a 10-mile radius thereof for 5¢ a gallon which was in accord with defendants'· threat to destroy Coatney's business in Lebanon.

The trial court was justified in finding from these facts that some understanding or agreement existed among defendants and others to regulate or control or maintain prices of liquid petroleum, and that there was some understanding among defendants and at least

894

one other which was intended to lessen full and free competition in the sale of liquid petroleum.

Having determined that the evidence supports the conclusion that defendants' activities violated the law in question, it remains to determine whether a right to injunctive relief was shown. As noted, this proceeding for injunctive relief is not for the purpose of assessing penalties against violators of the provisions of the statutes because of past violations or possible future violations. Nor is it the purpose of this proceeding to establish that a past violation did occur except as that fact may aid in establishing a basis for injunctive relief. Analogous sections of the Sherman Act are said to be purely remedial, and under them a court may not, under the guise of equitable relief and through the use of injunctive process, assess a penalty or punish for past transgressions. U.S. v. National Assn. of Real Estate Boards, 339 U.S. 485, 70 S. Ct. 711, 94 L. Ed. 1007, 1015, footnote 6; Hartford-Empire Co. v. U. S., 323 U. S. 386, 65 S. Ct. 373, 89 L. Ed. 322, 359, 360. The sole purpose of this injunctive proceeding is the protection of the public against the evils which result from price fixing and from agreements to lessen or destroy free competition. However, it must appear that there is some reasonable probability of a continuation of the menace to the public before injunctive relief is justified. Donnelly Garment Co. v. Dubinsky, 8 Cir., 154 F. 2d 38, 43[9-11].

Thus, the fact that a violation of the laws relating to monopolies, discriminations, and conspiracies has been proved, does not necessarily call for injunctive relief. Nor does the fact that §416.260 provides specifically that circuit courts may "prevent and restrain" violations of such laws change the considerations upon which equitable relief will be granted. Missouri Cafeteria, Inc. v. McVey, 362 Mo. 583, 242 S.W. 2d 549, 554[9]. It must appear that injunctive relief will accomplish the purpose of the proceeding, viz., to prevent continuing and probable future violations by those who have acted contrary to the proscriptions of the applicable statutes, and thus to the detriment of the public.

We note the Attorney General's bill was filed October 21, 1950; the trial [617] was January 16 and 17, 1951. The evidence in the record is not specific as to the situation which prevailed at the time of trial as compared to that proved in September and October, 1950. There was, however, no evidence that the understanding which existed prior to and during September and October, 1950 did not continue and also exist at the time of trial. Likewise, there was no evidence adduced from which it could be inferred that there was no reasonable expectation that the violations proved would not be continued or repeated. With the record before us in this condition, and particularly in view of the short time elapsed between the period covered by the proof and the time of trial, we may not say there was no reasonable probability that injunctive relief would accomplish the purpose of

this proceeding. On the contrary, we may say that the trial court could reasonably conclude that injunctive relief was necessary and proper to prevent continued participation in an agreement or understanding as to fixing, regulating, controlling, and maintaining prices and continued participation in an agreement or understanding intended to lessen free competition.

The trial court found that the evidence did not show any participation in an unlawful agreement or understanding by any of the four corporations named in the bill other than Missouri Hydro Gas Company. Inasmuch as the corporations named are not parties to this proceeding, we need not determine whether any named corporation other than Missouri Hydro was or was not a party to the agreement or understanding.

We point out that we have made no determination as to whether a violation of §416.120 (the unfair discrimination section) was proved. While we are inclined to the view that no violation of this section was proved, nevertheless it is unnecessary to make a determination on this question. This, for the reason that understanding with Missouri Hydro as to 5¢ gas in Lebanon constituted a violation of §416.040 in that it was an agreement intended to lessen free competition. Thus, the purpose of this proceeding in that respect may be accomplished without any determination as to violation of §416.120.

A portion of the judgment entered by the trial court was based upon a finding of a violation by defendants of §416.120 (the unfair discrimination section). Further, we are of the opinion that the judgment as entered by the trial court was, because of certain of its language, broader than necessary to provide for the specific relief justified by the evidence. For these reasons, the judgment herein should be modified and changed and the following judgment entered:

"Defendants are hereby permanently restrained and enjoined from regulating, controlling, or fixing the price or prices of liquid petroleum in Springfield, Missouri, by entering into, becoming a member of, participating in, or continuing to participate in any agreement, combination, confederation, or understanding with any person or persons or with any and all corporations, which agreement, combination, confederation, or understanding has for its purpose the regulating, controlling, or fixing of the price of liquid petroleum in Springfield, Missouri, or which does regulate, control, or fix the price of liquid petroleum in Springfield, Missouri, or which agreement, combination, confederation, or understanding has for its purpose the maintaining of any price resulting from any such agreement, combination, confederation, or understanding to regulate, control, or fix the price of liquid petroleum in Springfield, Missouri; and

"Defendants are hereby permanently restrained and enjoined from entering into, participating in, or continuing any participation in any arrangement, agreement, or understanding whereby, for the pur-

896

pose or with the intent of destroying or lessening full and free competition in the sale of liquid petroleum in Lebanon, Missouri, liquid petroleum is sold or caused to be sold in Lebanon, Missouri, for a lower price than that for which it is sold in Springfield, Missouri.

"The costs of this action are taxed against defendants."

The judgment of the trial court is reversed and the case remanded with directions to enter judgment in accordance with this opinion. *Van Osdol* and *Lozier, CC.,* concur.

PER CURIAM:—The foregoing opinion by COIL, C., is adopted as the opinion of the court. All the judges concur.