MARCUS HEATH, FLOSSIE HEATH, MARVIN HEATH, ANNE CATHERINE HEATH, ALBERT FLIPPIN, d/b/a HILLCREST DRIVE IN, Respondents, v. MOTION PICTURE MACHINE OPERATORS UNION No. 170, 1402 Main Street, Kansas City, Missouri, ANTHONY BADAMI, President, GEORGE BARRETT, business representative of the above Union No. 170, and JOHN DOE, as individuals and representatives of that class of individuals associated together in the above Union, Appellants, No. 45026—290 S. W. (2d) 152.

Division One, May 14, 1956.

*Eugene A. Farris, Alan F. Wherritt* and *William J. Turpin* for appellants.

936

*Robert F. Sevier* and *William E. Turnage* for respondents.

[153] COIL, C.—Plaintiffs, who claimed to be the joint owners and operators of the Hillcrest Drive In Theater, located about a mile north of Gashland on Missouri Highway 169, opened that theater for business on June 4 or 5, 1954. Either on June 4 or 5, 1954, and for [154] several nights thereafter, members of defendant union, acting on the order of defendant George Barrett, the union's business agent, and with the knowledge and approval of defendant Anthony Badami, the union's president, caused the theater to be picketed. Members of the public arriving at the entrance were informed by signs carried by the pickets that the theater did not employ union operators affiliated with the American Federation of Labor, and, perhaps, by a sign stating that the theater was unfair to organized labor, Motion Picture Machine Operators Union No. 170.

Plaintiffs successfully prosecuted their action to enjoin that picketing and defendant union and its president, Anthony Badami, and its business representative, George Barrett, as individuals and as representatives of the class consisting of the members of Local Union No. 170, have appealed. They contended in the trial court and contend here that prohibition of picketing under the facts and circumstances in evidence denies to them their constitutional right of free speech. Under all the circumstances shown in the record, we are of the opinion that this case involves the construction of the Constitution of the United States within the meaning of Article V, Section 3, Missouri Constitution of 1945, and is thus within the jurisdiction of this court. See Barber v. Time, Inc., 348 Mo. 1199, 1203[1], 159 S.W. 2d 291, 292[1-4].

The evidence showed that the theater was a local enterprise not engaged in interstate commerce and there was no evidence adduced which would support a reasonable inference that the controversy here involved affects interstate commerce to any substantial degree. In our view, decisive of our disposition is the fact question as to what status plaintiff Albert Flippin occupied with respect to the other plaintiffs and with respect to the conduct of the business known as the Hillcrest Drive In. We shall, therefore, review in some detail the evidence pertaining to that question.

Plaintiff Marcus Heath was the owner of the Plaza Theater in Liberty, Missouri. He there employed plaintiff Albert Flippin as the operator of the projection machine. Flippin was not and never had been a member of defendant union or of the international with which defendant was affiliated. Marcus Heath and his wife Flossie purchased 33.37 acres of land in April 1953, apparently as a site for an open-air theater. Thereafter, during the latter part of 1953 and during 1954, Marcus Heath, with the assistance of his son, Marvin

Heath, built the Hillcrest. Marvin, according to the testimony, had put into the equipment and construction of the theater (exclusive of the ground) $5,000 cash and a year's uncompensated labor. Marcus furnished all but $2,000 of the additional capital consumed in the construction and installation of the theater which, when completed (including Flippin's investment to be noted hereafter), represented a total cost of $100,000, as we understand, exclusive of the cost of the real estate. In March 1954, Marcus Heath engaged in a conversation with Flippin in which the subject of the cost of the Hillcrest was discussed. Heath indicated that he had spent more money than he had anticipated, but expressed the opinion that he had to proceed to completion. Flippin suggested that he could furnish $2,000, and Heath indicated that the $2,000 would help in the payment of some bills. As a result, Heath and Flippin met a short time later in the "Sweet Shop" operated in connection with the Plaza Theater, and there Flippin paid to Heath $1,500 in cash and Flippin's check dated March 6, 1954, for $500. In the meantime, Heath had written the following memorandum which was signed by Flippin and both Marcus and Marvin Heath at or shortly after the time the $2,000 was paid: "In consideration of $2,000 invested in Hillcrest Drive In but not in the real estate: Albert Flippin will share in 1/50 of the net profits. M.S. Heath and Marvin Heath shall have the first option of buying my 1/50 interest at any time after one year for $2000.

"If we refuse, Albert Flippin can sell to any person he desires to." .It appears that the entire transaction between Heath and Flippin consumed a period [155] of 30 to 40 minutes and that Flippin obtained the cash from its location in a watch repair shop which he, Flippin, operated in Liberty. Marcus Heath testified that he used the $1,500 cash to pay bills for materials and equipment which went into the drive-in theater and that the check was deposited in his account approximately a month after the date the check bore, and that the $500 obtained from the check was also used for the payment of bills in connection with the theater.

It was developed on cross-examination that Marcus Heath considered that, upon the signing of the memorandum, Flippin was a partner or a co-owner of the business, and that, while Flippin had no interest in the real estate, he did have a one-fiftieth interest in the buildings and other structures. Marvin Heath testified that he was a partner or co-owner of the theater except as to the real estate. Flippin testified that he understood he was one of the owners of the Hillcrest but that his sole duty was to run the projection machine; that he further understood that he, Marcus, and Marvin were the co-owners; and that while the profits from the snack bar probably were included by the terms of the memorandum, he did not claim an interest in the profits from that operation. He also said he was to get $80 per week for running the projection machine in addition to

his one-fiftieth interest in the profits; that he had not received the $80 per week to the time of trial; that he was to get the $80 only if the business made it; and that the only money he had received was $100 which he had to have.

It further appeared that a bank account was maintained under the name of Hillcrest Drive In Theater and a separate account under the name of Hillcrest Snack Bar; that each of the three men could write checks on the Hillcrest Drive In account; that the insurance policies on the theater were in the names of the five plaintiffs and that the account which was kept for the purpose of determining the excise tax due the United States was in the name of the five plaintiffs; and that no persons were listed as employees. It also appeared that the wives of the two Heaths claimed no interest in the proceeds of the theater operation.

The evidence further showed that it was not until May 1954 that defendant Barrett, on behalf of Local 170, talked with Heath or any-one connected with the Hillcrest operation, and it thus would appear that the transaction between the Heaths and Flippin was completed two months prior to any conversation of the present plaintiffs with any representative of defendant union. The evidence clearly established the fact that both Marvin Heath and Albert Flippin recognized that Marcus Heath was the "boss" in determining the policies and in carrying out the details of the theater's operation.

The trial court found as facts that the five plaintiffs were the owners of the theater and that plaintiff Albert Flippin was the operator of the projection machine. Defendants contend that the finding of the court below that Albert Flippin was a co-owner is against the weight of the credible evidence. They say that there was no legitimate partnership among the five plaintiffs, that the terms of the memorandum executed indicated that Flippin's participation in the project could be limited to one year, that such fact plus the circumstances surrounding the execution of the agreement and the payment of the money indicates that the arrangement was a fictitious one for the express purpose of permitting, in the event of any dispute with a labor union, the claim that Albert Flippin was a co-owner.

It is true, as defendants contend, that the exact relationship among the five plaintiffs was to a large extent a vague and indefinite one and perhaps so vague and indefinite as to defy a declaration of the legal relationship created in so far as concerned many questions which might arise as among the parties. It would appear, however, that the sole question we need to determine is whether by virtue of the executed memorandum and the understanding of the parties, Flippin was in the position (in so far as concerned defendant union) of a co-owner [156] or coproprietor of a business who was engaged in the self-operation of one of the tasks connected with the operation

of that business. If we assume, for the present, that the testimony pertaining to Flippin's status and the manner of its acquisition is true, then we are of the opinion that Flippin occupied a position which, for instant purposes, placed him in the same category as a bona fide partner who was entitled to the same immunity, if any, accorded to a one-man business in which the businessman-proprietor performed all of his work without the assistance of employees.

. The question of whether the testimony pertaining to the circumstances of the creation of Flippin's status is to be accepted as true depends entirely on the credibility of the witnesses who appeared in the trial court. We have noted the sequence of events shown in evidence, the testimony that Flippin obtained $1,500 in cash which he had on hand at his watch repair shop and gave it to Marcus Heath, the testimony that Flippin's $500 check was held for a month before its deposit, the rather casual manner in which this one-fiftieth interest in a $100,000 enterprise was acquired by Flippin, the prior relationship of employer and employee between Marcus Heath and Flippin, the lack of a definite understanding among the parties with respect to many aspects of the conduct of the theater, and other circumstances shown by direct and cross-examination of plaintiffs. All of those matters tend to create a doubt in the mind of one reviewing this cold record as to whether the arrangement between Flippin and the other plaintiffs was a legitimate, bona fide one. That is to say, whether Flippin was in fact a co-owner and co-operator of the theater or whether the entire arrangement was a fictitious scheme, studiously entered into for the purpose of avoiding the employer-employee relationship between the Heaths and Flippin with its attendant responsibilities and obligations. As we have noted, however, that doubt must be resolved, as we see it, by a determination of the credibility of the witnesses who testified on the subject. If their testimony was credible, then it is apparent that it furnished a substantial basis for the conclusion that Flippin in good faith purchased and became the owner of a one-fiftieth interest in the theater long before any controversy with a labor union appeared or was in prospect, and that the arrangement was entered into without contemplation of the instant or any other subsequent controversy with representatives of labor, and was not the result of a studied attempt to avoid the responsibilities and obligations of an employer-employee relationship. The findings in those respects, as we have said, depended upon the credibility of witnesses who appeared before the trial chancellor; we should, therefore, and we do defer to the trial chancellor's findings of fact as to the status of Flippin. State ex rel. Taylor v. Anderson, 363 Mo. 884, 893, 254 S.W. 2d 609, 615[7-10]. So deferring, we hold that plaintiff Albert Flippin was a bona fide co-owner of the Hillcrest Drive In. It follows that when Flippin operated the projection machine at the theater he occupied the status, for present purposes,

of a bona fide partner of Marcus and Marvin Heath in the business enterprise.

We find from all the evidence in the record that the instant picketing was peaceful; that it was conducted by only two persons at any one time; that there was no misconduct on the part of the individual pickets; that the message communicated by the signs was, from the standpoint of the pickets, truthful; and that there was no act of violence or intimidation on the part of any picket. The evidence further shows that the avowed objective of the picketing was to make known to those persons of the public who were prospective patrons that a union projectionist was not employed and to thereby attempt to induce the employment of a union projectionist. As we shall point out, that objective was in reality, under instant facts, to induce the co-owner of the theater not to operate the projection machine but to cease such self-operation and hire a union member in his place and stead.

The rules of defendant union, while not specifically excluding an owner-operator from membership, did exclude an owner-operator [157] from effective membership in that an owner-operator had no voice or vote in such union. And, we find that the most reasonable inference from the testimony of the business agent and other union members who testified was that an owner-operator would not be admitted as a member of defendant Local 170 if he occupied an owner's status at the time he initially applied. It would appear that if one were a picture machine operator and a member of defendant union and thereafter became a theater owner and continued to operate a projection machine, he probably would be permitted to continue a nominal membership in the union without voice or vote therein; but, as stated, one would not be admitted to the union for the first time in the status of an owner-operator. Consequently, it is fair to say that Flippin, being an owner-operator (as we have determined he was) and not having priorly belonged to defendant union, was ineligible for membership therein.

It was the policy of defendant union to oppose the practice of a theater owner operating his own projection machine and to use all lawful methods to prevent that practice. We are not concerned with the reasons for that policy except as they may affect the question of whether the effectuation of it was a legitimate labor objective. We may note, however, that the union's idea was that, but for the policy, fictitious and sham co-ownerships would be created and that, in any event, a theater owner's legitimate function could not be properly exercised in a projection booth; that an owner should be so located as to be able to properly perform his administrative and good-will functions.

Under the instant facts, then, we need determine only this narrow question: Should members of defendant labor union be permitted to picket the theater when the avowed purpose of the picketing is to in-

duce the owner-projectionist to cease and desist from operating his own projection machine and to hire a union member to replace him?

██  Picketing is a form of communication, but it "cannot dogmatically be equated with the constitutionally protected freedom of speech." Teamsters Union v. Hanke, 339 U.S. 470, 474. A picket line by its very nature exerts "influences, and it produces consequences, different from other modes of communication. The loyalties and responses evoked and exacted by picket lines are unlike those flowing from appeals by printed word." Hughes v. Superior Court of California, 339 U.S. 460, 465. Picketing, even though properly conducted in all respects, may be enjoined if its objective is unlawful as violative of the public policy of a state, either legislatively or judicially declared. And the enjoining of unlawful-objective picketing does not constitute a denial of the constitutional guaranty of free speech. Giboney v. Empire Storage and Ice Co., 336 U.S. 490; Hughes v. Superior Court, supra, 339 U.S. 466, 467. But a state may "not proscribe picketing merely by setting artificial bounds, unreal in the light of modern circumstances, to what constitutes an industrial relationship or a labor dispute", Teamsters Union v. Hanke, supra, 339 U.S. 479, 480, or prohibit picketing when there is no reasonable justification for the breadth of the restriction, American Federation of Labor v. Swing, 312 U.S. 321.

██ . Did the avowed objective of the instant picketing violate the policy of this state and thereby make the objective an unlawful one?

The Fourteenth Amendment has been construed as including within the fundamental rights conferred by it an individual's right to earn a livelihood at any common occupation. Truax v. Raich, 239 U.S. 33, 41. Labor union members have, under the constitutionally protected freedom of speech, the right to lawfully communicate the facts to the public concerning the conduct of another's business. So that it is not a conclusive answer to the instant question to say [158] that the fact that the picketing in the instant case (through which members of the public were informed that a union operator was not employed at the Hillcrest) was unlawful solely because it might affect adversely or even destroy one's constitutional right to earn a living with his own hands. That is because the basic right to work as one chooses may coexist with the right of others to communicate the facts concerning how one is exercising his right to work as he chooses. There is no longer any doubt that a state *may* permit picketing with the same objective as that of the picketing in the instant case without denying a proprietor-worker any right guaranteed by the Fourteenth Amendment. Senn v. Tile Layers Union, 301 U.S. 468. But on the other hand, the Fourteenth Amendment does not "prevent a State from denying the means of communication that picketing affords in a fair balance between the interests of trade unionism and other interests of the community." Dennis v. United States, 341 U.S. 494,

530 (concurring opinion); Teamsters Union v. Hanke, supra, 339 U.S. 478, 479.

Thus, to determine whether the objective of the instant picketing was lawful or unlawful, it is necessary to balance the right of a union and its members to improve their economic position through the form of communication known as "picketing" against the constitutional right of an owner to perform work with his own hands to his own best advantage in the conduct of his own business. That problem was discussed by the United States Supreme Court in Teamsters Union v. Hanke, supra, 339 U.S. 475-476, where the court said in part: "Here we have a glaring instance of the interplay of competing social-economic interests and viewpoints. Unions obviously are concerned not to have union standards undermined by non-union shops. This interest penetrates into self-employer shops. On the other hand, some of our profoundest thinkers from Jefferson to Brandeis have stressed the importance to a democratic society of encouraging self-employer economic units as a counter-movement to what are deemed to be the dangers inherent in excessive concentration of economic power. 'There is a widespread belief. . . that the true prosperity of our past came not from big business, but through the courage, the energy and the resourcefulness of small men . . . and that only through participation by the many in the responsibilities and determinations of business, can Americans secure the moral and intellectual development which is essential to the maintenance of liberty.' Mr. Justice Brandeis, dissenting in Liggett Co. v. Lee, 288 U.S. 517, 541, 580.

"Whether to prefer the union or a self-employer in such a situation, or to seek partial recognition of both interests, and, if so, by what means to secure such accommodation, obviously presents to a State serious problems. There are no sure answers, and the best available solution is likely to be experimental and tentative, and always subject to the control of the popular will."

There is no unanimity of opinion on the question posed. See Annotations, 2 A. L. R. 2d 1196 and 13 A. L. R. 2d 642, where cases reflecting the views of the courts of the various states are collected on questions like and similar to that involved in the instant case.

After careful consideration, we are of the view that striking a balance between "the constitutional protection of the element of communication in picketing and 'the power of the State to set the limits of permissible conduct open to industrial combatants'" requires the conclusion that the picketing in the instant case is not permissible conduct on the part of the members of defendant union. That conclusion results from a consideration of various relevant matters. We have taken into account the apparent relatively slight improvement in the union members' economic positions to be accomplished by picketing under the factual situation in the instant case, the element of unfairness inherent in the proposition that the union's policy may

not be satisfied by [159] the owner-operator joining the union, the importance to our economy of encouraging the self-employer—the one-man business, and, most important, the fact that in many readily apparent situations the effect of picketing, under facts like the instant ones, may be the total elimination of the businessman-worker by reason of the fact that to replace himself as a worker may make the continuation of his business economically impossible. We are of the opinion, therefore, that it is against the public policy of this state to permit the picketing under the instant facts.

Plaintiffs rely upon Hughes v. Kansas City Motion Picture Machine Operators, 282 Mo. 304, 221 S. W. 95. That case involved the same fundamental question as here on almost identical facts. In Hughes, a moving-picture projection machine was operated by one who claimed to be a theater owner. Picketing of that theater was by members of the same local union which is here involved. In a 4-to-3 decision, the court en banc reversed the lower court (which had dissolved a temporary restraining order) and ordered a permanent injunction entered enjoining the picketing. While we have not relied on the Hughes case as a decisive precedent in our disposition of the instant case, we have considered the result there reached and the views there expressed in determining what is or should be the policy of this state with respect to picketing under the circumstances there and here existing. We think the result in Hughes was correct on the facts as the majority opinion determined them to be, but as a careful reading of the majority, concurring, and dissenting opinions in Hughes will demonstrate, there is language employed which makes it uncertain upon what principle or principles the majority opinion proceeded to its correct result.

Point III in defendant's brief is: "The judgment in this case cannot include all of the members of the Union as a class because plaintiffs did not offer evidence to comply with Supreme Court Rule No. 307A." It is true, as defendants contend, that plaintiffs did not comply with the provisions of Supreme Court Rule 3.07(a) in that they did not specifically aver facts which showed that the alleged class representatives (or any other named defendant) had been fairly chosen and adequately and fairly represented the whole class (members of the union), nor did plaintiffs prove such by means other than the admissions of the defendants who were served. In our view, however, we need not determine that contention because, although plaintiffs alleged that defendant Motion Picture Machine Operators Union 170 was "a voluntary organization," defendant union (and no other defendant) raised "by specific negative averment" the issue of the capacity of defendant union to be sued as it was required to do by Section 509.140, RSMo 1949, V.A.M.S. Thus the judgment against the union bound its members and consequently the union members were properly within the prohibition of the injunction.

■ The judgment entered prohibited picketing so long as the plaintiffs *operated the theater* as co-owners. The judgment should be modified to prohibit picketing so long as a bona fide owner or co-owner of the theater *operates the projection machine* at such theater.

The case is remanded with directions to modify the judgment and decree in accord with the views above expressed and, as so modified, the judgment is affirmed. *Van Osdol, C.*, concurs in result; *Holman, C.*, concurs.

PER CURIAM:—The foregoing opinion by Coil C., is adopted as the opinion of the court. All concur except *Westhues, J.*, who concurs in the result and adopts the opinion of *Van Osdol, C.*, as his separate concurring opinion.

### MEMORANDUM ON CONCURRENCE IN RESULT

■ VAN OSDOL, C.—The well-written opinion of Judge Coil rules that picketing under the facts of the instant case is against the public policy of this state. See bottom page 10 and top of page 11. The result is reached by striking a balance between the constitutional protection of the [160] element of free speech involved in picketing and "the power of the State to set the limits of permissible conduct open to industrial combatants." Page 10. The various relevant matters which are specifically considered in arriving at the result include the "element of unfairness inherent in the proposition that the union's policy may not be satisfied by the owner-operator joining the union." Page 10. This element or "relevant matter," as I understand it, relates to the evidence and inferences recited and deduced in the first complete paragraph on page 7.

In studying the entire opinion I believe that Judge Coil would have dissolved the injunction had the owner-operator been eligible to join the union and by so joining he could have continued to operate his own projection machine. But I am not ready to agree that (in determining what is the public policy of this state in a factual situation otherwise like that in this case) the fact that an owner-operator may or may not join the picketing union (whatever may be the union's policy with respect to permitting an owner-operator union member to operate his own projection machine) is a decisive or even a relevant matter. So I concur in the result only.