**Rodney MILLS, Respondent,**

v.

**Urban C. BERGBAUER, Jr., Administrator of the Estate of George Thomas Mills, deceased, et al., Appellants.**

**No. 54180.**

Supreme Court of Missouri,
Division No. 2.

Jan. 12, 1970.

Motion for Rehearing or to Transfer to the Court En Banc Denied April 13, 1970.

Robert A. McIlrath, Flat River, Tyree C. Derrick, St. Louis, for respondent.

Marvin L. Dinger, Ironton, for defendants-appellants.

DONNELLY, Presiding Judge.

This suit involves 843 acres of land in Iron County, Missouri, owned by George Thomas Mills when he died intestate on April 5, 1964. George Thomas Mills is survived by plaintiff, Rodney Mills, and defendants Oral Mills, Dorothy Francis, Mildred Pruett, Goldie Young and Margaret Kemp, his sons and daughters.

Rodney Mills seeks specific performance of an alleged contract referred to in his petition as follows:

"Plaintiff states that on or about the 20th day of January, 1947, the deceased, George Thomas Mills, made and entered into an agreement with him by the terms of which he agreed to will and devise the above-described real estate to him if he would move back to the farm with him and look after his health and affairs and take care of him for the remainder of his life; and that thereafter the plaintiff entered upon the performance of the contract and discharged all of the duties incumbent upon him by reason and on account of said agreement, and continued to do so until he was appointed administrator of the estate of the deceased, George Thomas Mills."

A trial was had before the trial court, without a jury, and a decree was entered, which reads, in part, as follows:

"NOW, THEREFORE, IT IS ORDERED, ADJUDGED AND DECREED by the court that the alleged oral contract to make a will was entered into by and between the deceased, George Thomas Mills, and Rodney Mills, his son, on the 12th day of January, 1947, and that the plaintiff, Rodney Mills, performed his part of said contract, but that the said George Thomas Mills did not perform his part of the contract and died on the 5th day of April, 1964, without devising his property, both real and personal, to the said Rodney Mills, as he was required to do by the oral agreement;

\*    \*    \*    \*    \*    \*

"and it is further

"ORDERED, ADJUDGED AND DE-CREED by the court that title to the following described land, consisting of 843 acres,

\* \* \* \* \* \*

"be and it is by this decree vested in said Rodney Mills, free and clear of any claim of the defendants, or any persons claiming by, through or under them."

The applicable law is well-settled. In Walker v. Bohannan, 243 Mo. 119, 136, 147 S.W. 1024, 1028, 1029, this Court said: "(1) the alleged oral contract must be clear, explicit, and definite; (2) it must be proven as pleaded; (3) such contract cannot be established by conversations either too ancient on the one hand, or too loose or casual upon the other; (4) the alleged oral contract must itself be fair, and not unconscionable; (5) the proof of the contract as pleaded must be such as to leave no reasonable doubt in the mind of the chancellor that the contract as alleged was in fact made, and that the full performance, so far as lies in the hands of the parties to perform, has been had; (6) and the work constituting performance must be such as is referable solely to the contract sought to be enforced and not such as might be reasonably referable to some other and different contract; (7) the contract must be one based upon an adequate and legal consideration, so that its performance upon the one hand, but not upon the other, would bespeak an unconscionable advantage and wrong, demanding in good conscience relief in equity; (8) proof of mere disposition to devise by will or convey by deed by way of gift, or as a reward for services, is not sufficient, but there must be shown a real contract to devise by will or convey by deed made before the acts of performance relied upon were had."

The question is whether, under the evidence, the Walker v. Bohannan requirements are satisfied. We hold they are satisfied, and we affirm.

The evidence shows that the contract, as pleaded, was explicit and definite. Na-dine Mills, Rodney's wife, testified that she and Rodney were married November 26, 1946, and went to see Tom Mills in January, 1947. She further testified, in part, as follows:

"Q. Do you remember when in January you went down there?

A. The 12th day of January.

Q. What day of the week was that?

A. It was on—I think it was on Friday. It's been so long ago but I believe it was on Friday.

Q. And how long did you stay there that time?

A. We stayed until the weekend. On Monday. I think we went back on Monday.

Q. Now, did you overhear any conversation between Mr. Tom Mills and Rodney with respect to an alleged agreement for him to come down there and stay? A. Yes.

Q. Were you present at the time of this— at the time this discussion occurred? A. Yes, sir.

Q. Will you tell us just what type of house—or where was it? Inside the house or outside?

A. In the kitchen at the table. We had just eat breakfast.

Q. And was that on a Sunday? A. Yes.

Q. And you say that was the 12th of January? A. Yes.

Q. All right. Now, what were you fixing to do, Mrs. Mills?

A. We was fixing to go back up to Ste. Genevieve County.

Q. And after breakfast, what occurred with respect to the conversation?

A. Well, Rodney told his Dad that we were going to have to go home. Back up to Ste. Genevieve and his Dad said why didn't we just go and move our stuff and

come back and live with him. And take care of him and when he died, that everything he had would go to Rodney.

Q. And what did Rodney say in response to that?

A. Well, he told him he would.

Q. Right then and there?

A. Well, we'd talked it over. He said we'd have to talk it over and then we talked about it and we Rodney decided he would.

Q. Did you and Rodney go and talk about it outside of his presence?

A. Yes, we talked by ourselves.

Q. I see. And what was the purpose of your talking by yourselves?

A. Well, he didn't know whether I'd want to come down there and stay or not, with him.

Q. I see. And did you tell him that you would? A. Yes, I did.

Q. And what did you then do? What did he do with respect to talking to his father again about it?

A. Well, he went in and told him that he would go back and move down. Move his stuff and come down.

Q. And did you say anything to Mr. Mills about coming down with him? A. Yes.

Q. Mr. Tom Mills, I mean? A. Yes.

Q. Do you remember the conversation you had?

A. Oh, just that I would be glad to come down there and stay with him and do what we could do for him.

Q. I see. What was Mr. Mills words with respect to what he wanted Rodney to do for him? Do you remember?

A. He just said if Rodney would come there and take care of the place, the old home place and see that he was looked after, got his groceries and stuff that way, that when he died, it would be Rodneys.

Q. I see. Did he mention the word 'will' or anything of that kind, do you recall?

A. Yes, he said he would leave it when he died. Well, not a will. Just when he died, it would be left to Rodney."

Rodney Mills testified, in part, as follows: "Well, my dad, he told me, he says 'son, if you'll come down here and stay with me, I'll give you everything I've got.' He say 'every bit of my land and everything I've got that way, if you'll move down here.' "

On February 20, 1947, Rodney and Nadine Mills moved to Tom Mills' farm. The evidence is undisputed that Rodney Mills expended all of his money and a great deal of labor in attempting to improve the farm. He and his wife cared for his father as best they could. Tom Mills received a government check each month and this money was also used for his support and to support the joint efforts.

In 1956 or 1958 it became necessary for Nadine Mills to move to Minimum, Missouri, so that the children could attend school. Rodney Mills stayed with his father for two or three months and then joined his family. Thereafter, according to plaintiff, he and his sons went to see Tom Mills every day or two, cut his wood, took groceries to him, cut his hair, took cooked food to him, cleaned his house for him, and cared for his clothing. A significant portion of the transcript on appeal is devoted to proof of these allegations.

There was testimony on the part of defendants to refuse plaintiff's evidence in this regard, and also testimony indicating Tom Mills did not intend to will the farm to Rodney Mills. Oral Mills testified, in part, as follows:

"Q. (By Mr. Dinger) Now, can you tell me the last time that you talked to your father about the place or he talked to you?

A. Oh, it's been a couple of years ago I guess.

Q. Two years ago? A. Yeah.

Q. Now, at that time, who was there?

A. Just Dad and me.

Q. And what, if anything, did he say to you about the property?

* * * * * *

A. He just said that he didn't aim to will it to nobody. That he aimed to have the kids fight over it."

Dorothy Francis testified in part, as follows:

"Q. (By Mr. Dinger) Did he ever, at anytime, make any statement to you about the property?

A. Well, at one time he did, yes.

Q. Can you tell me when that was?

A. It was when they—Rodney and Nadine moved out and left him.

* * * * * *

A. And at the time, my father told me that day that Rodney and Nadine had moved out and left him and he said that they wanted him to make them a deed to the place but he said 'they won't get this property.' "

Margaret Kemp testified, in part, as follows:

"Q. Now, did your father, at anytime, talk to you about the property?

A. Well, yes, he did.

Q. Can you identify the time when he did? As closely as possible when he did talk to you.

A. Well, one time in particular, when Rodney and Nadine had moved out.

* * * * * *

Q. What did he say about the property?

A. Well, he said 'Rodney and Nadine wanted me to deed this property to them.' He said 'that's why they're mad at me and moved away.' And he said 'they'll never get this property. They've treated me too dirty.' And he said—he said 'they have gotten all the money I've got and will continue to get it as long as I've got a penny left.' "

Mildred Pruett testified, in part, as follows:

Q. Now, did you at anytime, discuss or did your father at anytime discuss with you about this property or say anything about the property? A. Yes, he told me—

* * * * * *

Q. (By Mr. Dinger) Now, this was on February 26th, 1964?

A. Yes.

Q. What did he say to you at that time about the property?

A. Well, he told me that he didn't intend to make out a will. That he intended to let the children fight it out—for the property. He said he had five hundred dollars saved up for each one of the children, is what he said."

Goldie Young testified, in part, as follows:

"Q. Now, did you at anytime, ever discuss this property with your father or he discuss it with you?

A. Only one time is all that he ever—

Q. Do you recall when that was? A. That was in April of 1960.

Q. And at that time what did he say to you about the property?

MR. McILRATH: If the Court please, I'm going to object to that until he states who was present.

Q. (By Mr. Dinger) Who was present?

A. I was the only one that was present. My husband had walked out to look at a little spring.

Q. And what did he say to you at that time?

A. He told me that he'd bought the six hundred acres of timber for Rodney to cut

off—to cut on and work on while he was there and he says 'I don't intend to will him the place'. He said 'I think he'll have his part when he works that timber'."

There is evidence that Rodney and Nadine Mills used money belonging to Tom Mills for their own benefit. These allegations were denied by Rodney Mills and Nadine Mills.

In State ex rel. Taylor v. Anderson, et al., 363 Mo. 884, 893, 254 S.W.2d 609, at 615 and 616, appears a statement particularly appropriate here:

"This being a suit in equity, we review the case de novo, weigh the evidence, and determine on the whole record what relief, if any, should be granted. Where, as here, however, there exists an irreconcilable conflict in the evidence on the essential fact issue involved, depending for determination on the credibility of witnesses, a situation prevails wherein the application of the rule of deference to the findings and conclusions of the trial chancellor is especially appropriate and necessary. * * * The trial chancellor's opportunity to observe the witnesses and to hear them testify affords him a basis for determining the credibility of testimony which we do not have. A review of the entire record in this case convinces us we should defer to the trial court's conclusion that the testimony of * * * [plaintiff's witnesses] was true."

We have reviewed the record in this case, and, in our opinion, the evidence satisfies the requirements of Walker v. Bohannan. We believe the judgment is for the right party. The judgment is affirmed.

All the Judges concur.

## ON REHEARING

PER CURIAM.

In their motion for rehearing, appellants ask that the opinion herein be modified so as to amend the decree of the trial court to expressly provide that the real estate in question shall be subject to claims properly allowed by the Probate Court of Iron County and costs incurred in the administration of the estate of George Thomas Mills.

The parties were asked to file suggestions on the question. In his suggestions filed in this Court, respondent concedes that the decree would not prevent "the administrator from taking the land to pay debts and the cost of administration of the estate if there be insufficient personal property from which to pay them." We agree.

Appellants' motion for a rehearing or, in the alternative, for a transfer to the Court en Banc, is overruled.