Blanche A. MALONE,
Plaintiff–Respondent,

v.

Robert L. SPANGLER, Administrator of the Estate of Clarence Robert Spangler, Deceased; Robert L. Spangler, Individually, and Darlene Cobb, Defendants–Appellants.

No. WD30892.

Missouri Court of Appeals,
Western District.

Sept. 2, 1980.

Motion for Rehearing and/or Transfer to Supreme Court Denied Oct. 1, 1980.

Application to Transfer Denied
Nov. 12, 1980.

Kenneth D. Kyser, Moberly, for defendants–appellants.

Channing D. Blaeuer, Cynthia A. Suter, Moberly, for plaintiff–respondent.

Before WASSERSTROM, C. J., Presiding, and PRITCHARD and KENNEDY, JJ.

WASSERSTROM, Chief Judge.

Plaintiff Blanche A. Malone sues to enforce an alleged contract by Clarence Robert Spangler, deceased, to devise to her his house and the contents.[1] The trial court granted a decree of specific performance, and the Administrator of Spangler's estate appeals. We affirm.

In 1969, Spangler was a 61 year old widower who lived in his own home in Moberly, Mississippi, with his retarded adult daughter. He suffered from multiple disabilities including extremely limited vision, emphysema, obstructive lung disease, severe atrophic proctitis which occasioned rectal bleeding, liver problems, enlargement of the abdomen, chronic gall bladder disease, internal and external hemorrhoids, colitis with bleeding and senility. He lived on a blind pension from the government and railroad retirement pay.

By 1969 Spangler's health had deteriorated to the point where he could no longer care for himself, much less for his daughter. During that year he met plaintiff for the first time at an auction held at his home. The acquaintanceship flowered, and a number of other meetings and visits followed. During these conversations, Spangler told plaintiff that he would have to institutionalize his daughter, that he himself would have to seek out some nursing home unless he could find someone who would stay with him and take care of his needs, and he asked plaintiff to become his housekeeper. These entreaties continued through the year 1969 and into 1970.

Finally a conversation occurred in November 1970, in which plaintiff testified Spangler stated that she would have to make up her mind at once and that this precipitated her accepting the housekeeping job. Plaintiff testified that in the November conversation, Spangler offered the following terms: "He said if you will come and live in my house and take care of me as long as I live I will give you the house and the furniture when I am gone, said I will leave a will and see that you get it, that you will always have a home." Spangler also said, according to plaintiff, that he would "pay the bills." Plaintiff accepted this offer and moved in that very day before noon.

At the time of the November conversation just related, Spangler still lived in a house on Moulton Street, but he had already made arrangements to sell that house three or four months prior to making the November

---

1. The petition alleges the formation and terms of the contract as follows: "On or about November 1, 1970, and while Plaintiff was a resident of the City of Moberly, State of Missouri, Plaintiff and deceased, Clarence Robert Spangler, entered into a certain contract whereby Plaintiff, on her part, was to make her home in decedent's home at 402 South Ault, Moberly, Missouri, and to devote her time solely and exclusively to the making of a home, keeping house, doing the cooking, mending and washing for deceased, and to the taking care of deceased during illness and looking after his general welfare and comfort so long as the said Clarence Robert Spangler should live. . . .

"Deceased, Clarence Robert Spangler, on his part, agreed with Plaintiff that if she would come to his home in Moberly, Missouri, and make a home for him, keep house, do his cooking, mending, washing, take care of him during illness and look after his comfort and general welfare, he would, upon his death, leave a will, leaving to her the home he would purchase and which he subsequently did purchase located at 402 South Ault Street, Moberly, Missouri, all contents thereof, and the real estate upon which said house is located. . . .

\*   \*   \*   \*   \*   \*

"Plaintiff accepted the terms and conditions of said contract and has fully and faithfully performed all of the conditions and terms of said contract on her part to be performed. . . ."

offer to plaintiff. Although plaintiff moved into the Moulton residence, she knew of the impending sale and she and Spangler had discussed his plan to purchase a replacement home. They both participated in looking for a replacement house.

The new home on South Ault was purchased in December 1970. In connection with the closing of that transaction, plaintiff accompanied Spangler to his lawyer's office and Spangler instructed the lawyer to put title in joint names between him and plaintiff, with rights of survivorship. Plaintiff, however, demurred and declined to let the title be so made. She testified that the reason for this was that she was not sure whether she would be able to carry through her contract to care for Spangler, especially in view of the fact that Spangler had in prior years suffered a drinking problem; and plaintiff wanted to feel free to leave without feeling tied down and obligated because of being a co-owner of the property. Further, she did not believe it necessary to be on the deed, Spangler having already agreed to make a will leaving her the house and furniture.

From November 1970 until Spangler's death in September 1978, plaintiff performed numerous services consisting of general housekeeping, washing, ironing, preparing meals, yard and garden work, driving Spangler around and paying bills. Until April of 1975, plaintiff took time off once or twice a year for visits to Illinois where she owned some property and where she visited her son. She testified that this was necessary in order for her to rest up from her duties on behalf of Spangler. However, in 1975 she sold the Illinois property and thereafter until Spangler's death took no time off from her 7–day a week full time duties in Moberly.

In addition to the duties already mentioned, plaintiff undertook practical nursing care. Some of this entailed very unpleasant tasks. For instance, when Spangler had trouble breathing at night as a result of his emphysema, he would choke and she would have to pull streams of phlegm out of his throat. In response to that problem, Dr. Hobbs had prescribed a special breathing machine which she would have to hook up for Spangler's use. In addition, Spangler's rectal problems caused him to often bleed so badly that he would lose a dangerous amount of blood, and this sometimes left a puddle of blood on the bed from hemorrhaging.

A number of witnesses testified as to the extensive services performed by plaintiff and the dependence which Spangler had upon her. The performance and good quality of these services were freely admitted by Spangler's son and daughter on whose behalf the Administrator was and is resisting plaintiff's claim.

At the conclusion of all the evidence, the trial court ruled in plaintiff's favor pursuant to the following findings:

"[O]n or about the 1st of November, 1970, Clarence Robert Spangler made an oral agreement with plaintiff Blanche A. Malone, if she would move into his home and make a home for him, keep house, do his cooking, washing, take care of him and look after his comfort and general welfare, he would leave a will leaving to plaintiff, Blanche A. Malone, the home he was getting ready to purchase and which he did purchase in the latter part of December, 1970, and all the contents thereof. * * * Plaintiff Blanche A. Malone accepted the terms and conditions of the contract and has fully performed all of the conditions and terms of the contract required to be performed by her by moving into the home of Clarence Robert Spangler in late 1970, kept house for him, did his cooking, washing and took care of him until his death on September 3, 1978. . . . ."

The Administrator's challenge to the trial court action rests upon his contention that the evidence was insufficient under the applicable legal standards to warrant the relief granted. The Administrator refers to the well established rule stated in *Mills v. Bergbauer*, 452 S.W.2d 237 (Mo.1970) and prior cases that an oral contract to make a will is permitted as an exception to the Statute of Frauds, but that recovery under such a contract will be allowed only if the following requirements are met:

" '(1) the alleged oral contract must be clear, explicit, and definite; (2) it must be proven as pleaded; (3) such contract cannot be established by conversations either too ancient on the one hand, or too loose or casual upon the other; (4) the alleged oral contract must itself be fair, and not unconscionable; (5) the proof of the contract as pleaded must be such as to leave no reasonable doubt in the mind of the chancellor that the contract as alleged was in fact made, and that the full performance, so far as lies in the hands of the parties to perform, has been had; (6) and the work constituting performance must be such as is referable solely to the contract sought to be enforced and not such as might be reasonably referable to some other and different contract; (7) the contract must be one based upon an adequate and legal consideration, so that its performance upon the one hand, but not upon the other, would bespeak an unconscionable advantage and wrong, demanding in good conscience relief in equity; (8) proof of mere disposition to devise by will or convey by deed by way of gift, or as a reward for services, is not sufficient, but there must be shown a real contract to devise by will or convey by deed made before the acts of performance relied upon were had.' "

■ The Administrator argues that the foregoing requirements are not met by the evidence here. He first challenges the finding in favor of the contract alleged, pointing out in his brief that "[t]he only person to testify at the trial that there was an actual agreement as alleged in Plaintiff's Petition was the Plaintiff, Blanche A. Malone." It is true that the only direct evidence of the contract in question was that given by plaintiff herself. Whether that testimony could have been excluded under the Dead Man's Statute is not before this court, for the reason that no objection was ever made to plaintiff's testimony on that ground. Her testimony was, of course, nevertheless subject to discount on the basis

of interest, but that was a matter for consideration by the trial court. The trial court heard the evidence in person and his acceptance of plaintiff's testimony is entitled to deference. Rule 73.01–3(b); *Mills v. Bergbauer, supra; Murphy v. Carron*, 536 S.W.2d 30 (Mo. banc 1976).

■ The Administrator also levels an attack on the proof of the contract, saying that the testimony indicated an intention by Spangler to give plaintiff only a life estate in the house rather than title in fee simple as alleged and contended for by plaintiff. In this connection the Administrator emphasizes that portion of plaintiff's description of the November 1970 conversation in which she stated that Spangler told her "that you will always have a home." The Administrator also emphasizes testimony that Spangler had stated that he wanted plaintiff to have the house "to live in as long as she lived." Considering the evidence as a whole, it did not appear to the trial court, nor does it appear to us, that the November contract contemplated simply a life estate, but rather the evidence shows that the parties contemplated and intended that title in fee simple would go to plaintiff.

■ The Administrator further argues that plaintiff's performance was not referable solely to the contract, but rather was the result of affection between Spangler and plaintiff and that the tasks performed by her were in the nature of wifely duties. In support of this argument, the Administrator relies on evidence of a number of proposals of marriage by Spangler which plaintiff at least at one time seriously considered,[2] the fact that Spangler frequently called her "Honey," and the fact that she was treated as a member of the family by relatives. The Administrator further points to the fact that when Spangler's relatives visited, plaintiff on some occasions gave up her separate bedroom for use by the visiting relatives and she on those occasions would share Spangler's bed. The Administrator also points to evidence that on the

**2.** Plaintiff testified that she decided against marriage because one or both of Spangler's railroad pension or her pension through her deceased husband would probably be lost. In

addition, Spangler had told her he was impotent and plaintiff testified that in such a case there was no reason for marriage.

occasion of two family funerals outside Moberly, to which plaintiff accompanied Spangler, she signed the "memory books" as Mr. and Mrs. Clarence Spangler. Under all of the facts, the Administrator's interpretation appeared strained and unpersuasive to the trial court, as it does also to us. We believe that plaintiff's performance here was referable to the November contract with Spangler and none other. *See Watkins v. Watkins*, 397 S.W.2d 603, l.c. 610 (Mo. 1965).

■ It would unduly lengthen this opinion to discuss in detail the other nagging complaints which the Administrator directs at plaintiff's proof. Suffice it to say that we have considered each point argued by the Administrator and nevertheless conclude that the trial court was justified in finding that the contract was made as alleged, was fully performed by plaintiff, that the contract was fair and equitable and that it should be enforced.

Affirmed.

All concur.